IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 738 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on May 15, 2015, in |
| | : | the Court of Common Pleas, |
| v. | : | Washington County, Criminal Division |
| | : | at No. CP-63-CR-0000236-2012. |
| | : | |
| JORDAN ALEXANDER CLEMONS, | : | SUBMITTED: April 9, 2018 |
| | : | |
| Appellant | : | |

## OPINION

**JUSTICE WECHT**                                    **DECIDED: January 23, 2019**

In May 2015, a Washington County jury found Jordan Clemons guilty of first-degree murder for killing Karissa Kunco during the early morning hours of January 12, 2012. Upon the jury's recommendation, the trial court sentenced Clemons to death. In this direct appeal, Clemons asserts numerous instances of trial court error and challenges the weight and sufficiency of the evidence.[1] For the reasons that follow, we affirm Clemons' judgment of sentence.

## I. Background

### A. The Protection from Abuse Order

In late 2011, Clemons and Kunco were involved in a romantic relationship, and had lived together in the recent past. On December 18, 2011, at around 4:00 a.m., Kunco entered Clemons' residence and found him asleep. Clemons awoke and started

---

[1] This Court has exclusive and automatic jurisdiction over capital appeals pursuant to 42 Pa.C.S. § 722(4) and 42 Pa.C.S. § 9546(d).

screaming at Kunco. Clemons grabbed her by the arms and neck, leaving bruises and marks. Clemons also punched and scratched Kunco in the face. After the assault, Clemons went back to sleep.

Kunco called her mother, who subsequently took Kunco to a police station to report the assault. Police officers advised Kunco to seek a protection from abuse order ("PFA"). On December 19, 2011, Kunco filed a petition for a PFA in the Court of Common Pleas of Allegheny County. Therein, Kunco recounted the assault and asserted that she feared for her safety. She also indicated that Clemons had threatened to kill himself. The court (per the Honorable Arnold Klein) issued a temporary PFA, which was scheduled to expire on December 27, 2011. At approximately the same time that the PFA issued, police filed simple assault charges against Clemons, and a warrant issued for his arrest.

Kunco went to a hospital to be treated for her injuries. As part of the examination, hospital staff took photographs of her injuries. One such photograph depicted injuries on Kunco's face, including scratches on her nose and cheeks and swelling and bruising around her eyes.

A hearing to extend the temporary PFA was scheduled for December 27, 2011. However, that hearing was continued until January 23, 2012, by order of the Honorable Kathryn Hens-Greco, Administrative Judge. Judge Hens-Greco also extended the active status of the temporary PFA to the new hearing date. Clemons never was served with a copy of either the original PFA or the paperwork extending the PFA's active status. Nonetheless, Clemons knew that Kunco had obtained the PFA and that there was a pending warrant for his arrest. *See* Notes of Testimony ("N.T."), Vol. I, 5/4/2015, at 67. Thus, at all times relevant to this appeal, Clemons knew that he was prohibited from contacting Kunco.

**B.  The Evening of January 11, 2012 and the Morning of January 12, 2012**

On January 10, 2012, Clemons and Kunco began a Facebook conversation during which Clemons acknowledged that Kunco had obtained a PFA against him.  The conversation on that date centered upon Clemons' apparent decision to turn himself in to the police.  Kunco encouraged Clemons to stop running and to surrender to the authorities.  She told Clemons that she loved him, that she was sorry, and that she missed him.

The conversation continued into January 11, 2012.  Clemons repeated his plan to turn himself in, but said that he would not do so without first seeing Kunco.  Clemons told Kunco that he would kill himself if she did not agree to meet him.  He even told her that he already had purchased a gun.  Clemons insisted that Kunco was the only person that could help him.  Kunco was conflicted.  She had positive feelings for Clemons, including love and empathy.  At the same time, she was terrified of him.  She repeatedly told Clemons that she was afraid of him, and that she was furious with him for putting her in that position.  Kunco also felt that meeting Clemons would be a betrayal of her friends and family, who did not want her to associate in any way with Clemons due to the prior domestic abuse.  Kunco explained to Clemons directly that seeing him would hurt everyone else in her life who loved her.  Nonetheless, even though she felt that "[t]his is such a bad idea," N.T., Vol. I, 5/4/2015, at 74; Commonwealth's Ex. 2, she relented and agreed to meet him.

At approximately 5:30 p.m., Kunco, driving a black Toyota two-door convertible, picked Clemons up on Maytide Street in Brentwood, Allegheny County.  Shortly thereafter, Kunco and Clemons drove to a PNC Bank branch in Brentwood, where Kunco used an ATM to withdraw funds.  Amanda Stasiowski also was at the bank.  Stasiowski observed Kunco, wearing a bright pink Point Park University sweatshirt, walk from the

ATM to the black Toyota and enter the car on the driver's side. Stasiowski also saw the profile of a person sitting in the passenger seat, but she could not identify that person. Video footage from surveillance cameras at the bank later confirmed this account. Stasiowski was the last person (other than Clemons) to see Kunco alive.

Over the next few hours, Clemons used Kunco's debit card as well as a card belonging to Kunco's father, Paul Kunco. Clemons used Kunco's card to purchase gas at a service station in Washington, Pennsylvania. At approximately 12:30 a.m. on January 12, 2012, Clemons unsuccessfully attempted to withdraw funds from a drive-through ATM at a bank in Washington using Kunco's card. Surveillance footage confirmed the attempt, although it did not capture Clemons' face. The surveillance footage did show the left arm of the person using the ATM. That arm bore tattoos identical to those on Clemons' left arm.

At 2:10 a.m., Clemons entered a Walmart in Washington, where he used Paul Kunco's debit card to purchase a video game system. Clemons then returned to Kunco's car and drove away. This sequence of events also was captured by surveillance video.

At 6:00 a.m., Clemons tried to buy cigarettes at Winkle's Gas Station in Cecil Township. Leah-Ann Andrews, the attendant, knew Clemons from frequent prior interactions at the station. Despite this familiarity, Andrews asked Clemons for identification before selling him the cigarettes. Andrews detected no signs of intoxication, but noted that Clemons appeared nervous and fidgety. Instead of producing identification, Clemons held out an orange PNC Bank debit card. Clemons then turned around, walked out of the store, entered Kunco's vehicle, and drove away.

## C. The Initial Investigation

Meanwhile, a few hours after Kunco picked up Clemons, Kunco's mother (Kathy Kunco) had grown concerned about Kunco's whereabouts. At approximately 8:36 p.m. on January 11, 2012, accompanied by Donny Makowski (Kunco's stepfather), Kathy Kunco went to the Baldwin Borough police station to report Kunco missing. The two met with Officer Sean Biagini, telling him that they believed that Clemons might be involved in Kunco's disappearance. Officer Biagini was able to learn of a number of addresses at which Clemons might be located. Officer Biagini dispatched other officers of his agency to attempt to find Clemons at those locations. Officer Biagini also broadcast a BOLO ("be on the lookout") alert for Clemons, Kunco, and Kunco's vehicle within a fifty-mile radius. During the initial stages of the investigation, Officer Biagini learned that there may have been an active warrant for Clemons' arrest. In light of this information, Officer Biagini contacted Washington County Probation Services in order to ascertain whether that department knew of Clemons' most recent address. Officer Biagini also had Kathy Kunco and Makowski complete a missing persons form, which the officer then submitted into a nationwide system that catalogues missing persons for law enforcement agencies.

Kathy Kunco also provided Officer Biagini with both Kunco's and Clemons' mobile telephone numbers. Officer Biagini transmitted the numbers to the supervisor of Baldwin Borough's dispatch center. The supervisor then "pinged" those numbers, a process that approximates the location of a particular cell phone based upon the location of the tower with which that phone is communicating via cellular signal. The "ping" indicated that Kunco's and Clemons' phones were within close proximity to one another, and that they were "pinging" off of a tower in Hickory Township, Washington County. Officer Biagini notified the Pennsylvania State Police (the agency providing law enforcement services

for Hickory Township) that Kunco and Clemons could be in that vicinity, and requested that troopers canvass that area for Kunco's vehicle.

Officer Biagini continued to direct the investigation from the Baldwin Borough station, including requesting follow-up "pings" in an attempt to track Kunco's and Clemons' movements. Officer Biagini then learned of suspicious activity involving a debit card linked to Kunco's father, Paul Kunco. Officer Biagini contacted Paul Kunco and informed him that someone had used, attempted to use, or was in the process of using his debit card that night. The police used those attempted transactions, and those using Kunco's debit card, in an effort to track Clemons' movements. Still, they could not locate Clemons or Kunco.

At approximately 9:24 a.m. on January 12, 2012, Officer James Falconer of the Cecil Township Police Department in Washington County was dispatched to Gladden Road to investigate a car crash. When Officer Falconer arrived, he observed Kunco's vehicle resting against a tree off the road. The vehicle was still running in forward gear. Officer Falconer opined that the vehicle failed to negotiate a bend in the road, drove off the road, and collided with the tree.

Officer Falconer opened the driver's door, but found no one inside. However, he observed a significant amount of blood and human feces on the back seat. He walked around the vehicle and opened the passenger's door. On the seat, the officer found a purse. He then reported the crash to 911 operators and asked that the vehicle's registration be checked in order to identify the owner. Dispatch informed him that the vehicle was the subject of a BOLO. By that time, a firefighter and paramedics had arrived at the scene. One of the paramedics had put the car in park and turned off the engine. Officer Falconer immediately told everyone to get away from what he now considered a crime scene. The officer also closed both ends of Gladden Road.

A few hours later, Corporal Richard Hunter of the Pennsylvania State Police's Forensic Services Unit arrived at the site of the crash and processed the scene. After photographing and videotaping the scene, Corporal Hunter opened the Toyota's driver-side door and immediately noticed blood on the interior of that door as well as a significant amount of blood in the back seat. Corporal Hunter and his team retrieved numerous physical items laying on the ground outside of the car. They found, *inter alia*, a red butane lighter, a $CO_2$ cartridge, and a Sheetz coffee cup. The team also recovered three Coors Light beer cans on the ground near the car. All three cans were empty. One can had a puncture hole in the side. Another can was sealed at the top, but had a dent on the side that perforated the can and permitted the liquid to drain out.

Pennsylvania State Police Trooper Todd Porter, also with the Forensic Services Unit, examined the vehicle further. Inside, he found Kunco's driver's license, a bra, a bloody pair of women's pants, and a medical document with Clemons' name on it. Trooper Porter removed the back seat, which had been soaked through with blood, and found additional pooling of blood underneath. The trooper found no drugs or alcohol (or even empty alcohol containers) inside the car. However, he did discover a plastic bag containing a white residue, as well as a piece of Chore Boy, which is a steel wool pad that commonly is used to facilitate the smoking of crack-cocaine.[2]

At approximately the same time that Officer Falconer located the Toyota, William Baholich and Eric Schaude, employees of Bankson Engineers, Inc., were driving on Washington Avenue and Sabo Road in Hickory Township in order to begin a survey of the surrounding land for purposes of determining where to place water and sewer lines.

---

[2] When crack-cocaine is smoked using a pipe or a tube, a piece of Chore Boy, or other brand of steel wool, typically is placed in the pipe to prevent the rock of crack-cocaine from rolling down the pipe into the user's mouth. This also ensures that the rock stays in place while being heated with a flame to produce the smoke to be inhaled. *See generally*, N.T., Vol. IV, 5/7/2015, at 183-84.

As the men drove along Sabo Road, Schaude noticed a bright pink sweatshirt lying among the leaves at the base of a tree. Although the presence of the colorful shirt among the brown leaves and dirt raised the men's suspicions, they drove on in order to continue their survey of the land. They agreed to return later in order to investigate the sweatshirt.

At approximately 11:20 a.m., Baholich and Schaude did return to the area of Sabo Road. Upon seeing the sweatshirt, they parked their truck. They noticed what appeared to be drag marks in the mud leading from the road into the woods. They then walked over to the sweatshirt, which had blood on it. They also found a pair of women's underwear and a sock lying amid the leaves. Finally, Baholich and Schaude saw what they believed was an outline of a human body. In order to confirm this, they moved a few leaves, revealing a socked foot. They then called 911.

When Corporal Hunter finished processing the Toyota, he drove to the location where Baholich and Schaude had found the body, which was approximately seven to eight miles from Gladden Road. As Corporal Hunter examined the scene, he noticed that the pink sweatshirt was saturated with blood around the waist area and was draped over the body. A twenty or thirty pound decomposing tree stump had been rolled on top of the body. Corporal Hunter scanned the area around the drag marks and the body. He found a bottle of spray deodorant, a styrofoam cup, and a purple woman's shirt. Finally, he located an empty Bud Light beer can.

At 2:42 p.m., Washington County Coroner Timothy Warco reported to Sabo Road in order to inspect the body. Coroner Warco removed the tree stump and the leaves, revealing a naked woman's body. There was a severe, deep laceration across the woman's throat. Based upon the nature of this wound, Coroner Warco expected to find an extraordinary amount of blood around and under the body. But he found no pooling

of blood whatsoever. Thus, the Coroner deduced that the injury must have been inflicted at a different location.

Warco arranged for the body to be transported to the morgue for autopsy. There, Donny Makowski (Kunco's stepfather) confirmed that the victim in fact was Karissa Kunco. Forensic pathologist Abdulrezak Shakir, M.D., performed an autopsy on Kunco's body. Dr. Shakir observed an incision across Kunco's entire neck and throat area. The wound penetrated through her throat all the way to her spine. The injury would cause a significant amount of bleeding, possible defecation due to the shock of the injury, and a quick death. Dr. Shakir observed no defensive wounds or indicia of a struggle, nor did he detect any trauma to Kunco's genitalia. Dr. Shakir determined that the wound to the neck was the cause of Kunco's death, and that the manner of that death was homicide.

### D. Clemons' Actions After the Murder

In the days leading up to the murder, Clemons had been staying in the Carrick section of Pittsburgh, along with Randol Taylor and Samantha Rush, Taylor's girlfriend. Taylor allowed Clemons, who had been his friend for twelve or thirteen years, to live with him and Rush because Clemons had nowhere else to live. Throughout their friendship, Taylor and Clemons drank alcohol and used drugs together on an almost daily basis, including Ecstasy, marijuana, and opioid pills. However, in the days leading up to, and including January 11, 2012, Taylor did not see Clemons ingest or imbibe any intoxicating substances.

On January 11, 2012, Taylor and Rush left the residence to buy groceries sometime between 5:00 and 6:00 p.m. Taylor did not take his cell phone with him when the two left. He left the phone in the residence with Clemons. When Taylor returned approximately forty-five minutes later, both Clemons and the cell phone were gone.

Taylor used Rush's phone to call his own phone. Clemons answered the call and told Taylor that he would return soon. However, Clemons did not come back that night. Taylor tried to contact Clemons throughout the night, but Clemons did not answer the calls.

At approximately 8:00 a.m. on January 12, 2012, Clemons called Taylor. Clemons was crying and stated, "I'm sorry, I'm sorry. She's dead." N.T., Vol. II, 5/5/2015, at 157. Taylor also started crying, but he did not ask who was dead. Clemons threatened to kill himself, which concerned Taylor because Clemons had attempted suicide once before. Taylor ended the phone call, and he and Rush left the residence to retrieve Clemons.

Clemons called Rush and directed her to Kunco's crashed vehicle on Gladden Road. When Rush and Taylor pulled up, Clemons exited the driver's seat of Kunco's vehicle and entered Rush's vehicle. No one spoke as the trio traveled back to Taylor's and Rush's residence. Notably, during that period, Clemons exhibited no signs of intoxication.

Upon arrival, Taylor called his father, Robert Taylor ("Robert"). Taylor was crying, and told Robert that he was scared. Robert drove immediately to Taylor's residence. Robert informed Clemons that morning news reports had implicated Clemons in Kunco's disappearance. Robert asked Clemons if the allegations were true; Clemons admitted that there was some truth to the claims. Robert told Clemons that Clemons could not stay at Taylor's home. Robert drove Clemons and Taylor to Robert's residence in the Allentown section of Pittsburgh. Robert fed Clemons and then told him that he could not stay there either. A few hours later, Robert and Taylor left Robert's residence to visit a family member at a local hospital. On the way, Robert dropped Clemons off at a residence on Beltzhoover Avenue in Pittsburgh. Robert did not see Clemons again until approximately 7:00 p.m., when Clemons appeared on Robert's doorstep.

On the morning of January 12, 2012, Freda Thorpe, Clemons' mother, was attending a conference in Atlanta, Georgia. Thorpe received a call from Kunco's mother, who informed Thorpe that Kunco had gone missing and that authorities believed that Clemons was connected to Kunco's disappearance. Thorpe's daughter also called to tell Thorpe that Clemons was being identified on the Pittsburgh area news as a possible perpetrator. Later that morning, Thorpe learned that Kunco was found dead. She repeatedly tried to contact Clemons, but to no avail.

Immediately, Thorpe flew back to Pittsburgh. Shortly after the plane landed, Clemons called Thorpe. He refused to tell her where he was, but insisted that he had nothing to do with Kunco's death. Clemons and Thorpe remained in phone contact throughout the day. During those calls, Clemons told Thorpe that he was high on drugs, and that he intended to continue to use drugs as the day progressed. Clemons had experienced difficulties with drugs and alcohol since the age of fourteen, problems that he attempted to overcome in multiple stints in rehabilitation facilities. Having supported Clemons during those experiences, Thorpe recognized that Clemons was intoxicated when he talked to her on the phone.

Eventually, Clemons agreed to meet Thorpe at a residence on Beltzhoover Avenue. However, Clemons never arrived. Thorpe subsequently learned that Clemons had appeared at Robert's house. She called Robert, who confirmed that Clemons had returned to Robert's house around 7:00 pm. Robert told Thorpe that he would keep Clemons there until she arrived. When Thorpe entered Robert's house, she noticed that Clemons looked "skinny, malnutritioned, . . . just, like, sloppy." N.T., Vol. IV, 5/7/2015, at 119. He "reeked of alcohol and some kind of smoke." *Id.* at 127. Thorpe's brother, who accompanied Thorpe, observed that Clemons' eyes were red and watery, and that Clemons appeared to be under the influence of either alcohol or drugs. Thorpe went to

Clemons and hugged him. She asked him if he knew anything about what had happened to Kunco. Clemons denied responsibility, and stated, "Everything is a blackout. No, Mom." *Id.* at 110.

### E. The Pennsylvania State Police Barracks

After some effort, Thorpe convinced Clemons to turn himself in. On the drive to the police station, Clemons sat in the middle of the back seat. Thorpe's pastor, Melanie Davis, sat in the front passenger seat. From that distance, Pastor Davis could smell an odor of alcohol coming from Clemons. The smell was so pungent that Pastor Davis felt compelled to offer Clemons a piece of chewing gum, which Clemons accepted.

Clemons surrendered at the Pennsylvania State Police barracks in Washington, Pennsylvania, just before midnight on January 12, 2012. Clemons was met by Trooper Pierre Wilson. Trooper Wilson assisted Clemons out of the vehicle. This was done pursuant to protocol, not because Clemons was having trouble getting out of the car. Clemons was docile and quiet. The trooper noticed that Clemons had bloodshot eyes and smelled strongly of alcohol. However, despite exhibiting outward indicia of alcohol consumption, Clemons did not stumble or fall at any point, did not lean against the trooper for balance, did not ask for assistance or clarification on any directive, and did not evince any other signs of intoxication as he was escorted through the barracks.

Trooper Thomas Schuster assisted Trooper Wilson in taking Clemons into custody. He, too, picked up a "heavy scent" of alcohol coming from Clemons. N.T., Vol. III, 5/6/2015, at 121. Once inside the barracks and in an interview room, Trooper Schuster informed Clemons that he was under arrest, and he advised Clemons of his *Miranda*[3] rights. Clemons did not elect to waive those rights, nor did he acknowledge that he

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

understood those rights. Instead, Clemons simply uttered: "I just want to let you guys know you have it all wrong. I did not kidnap her. She picked me up at the top of Maytide. We stopped at the bank, began to argue. She hit me in the head. That's all I remember." *Id.* at 123. Clemons clearly articulated these words, and did not exhibit any other common signs of intoxication.

Upon a cursory inspection of Clemons' outer appearance, Trooper Schuster observed what appeared to be blood spots on Clemons' shoes. Trooper Schuster took the shoes into custody as potential physical evidence.

### F. Forensic Testing

Michelle Barch, an expert in serology, examined a number of items for the presence of blood or semen. On Clemons' shoes, Barch found nine separate spots that tested positive for human blood. She also found human blood on samples taken from fingernail clippings from both of Clemons' hands. Barch also examined genetic material obtained from Kunco's vagina. Barch identified the presence of intact sperm cells in the vaginal sample. That the sperm cells were intact means that they were deposited inside the vagina within twenty-four hours before the sample was obtained. Branch also found the presence of blood in the vaginal sample. All of the serological samples were then submitted for DNA testing.

Julia Brolley, an expert in DNA profiling and analysis, examined the samples. Using known samples from both Kunco and Clemons, Brolley first determined that the blood spots on Clemons' shoes matched Kunco's blood. Next, Brolley concluded that the blood samples taken from underneath Clemons' fingernails were mixed samples that matched Clemons, Kunco, and possibly a third person. As well, Brolley examined the

genetic profile created from the sample obtained from Kunco's vagina, and found that the majority of the spermatozoa portion of the sample matched Clemons' DNA profile.

## G. Pre-Trial Motions

Clemons was charged in Washington County with criminal homicide, 18 Pa.C.S. § 2501, aggravated assault, 18 Pa.C.S. § 2702, abuse of a corpse, 18 Pa.C.S. § 5510, unauthorized use of automobiles, 18 Pa.C.S. § 3928, tampering with physical evidence, 18 Pa.C.S. § 4910, and two counts of access device fraud, 18 Pa.C.S. § 4106. On May 1, 2012, the Commonwealth filed a "Notice of Aggravating Circumstances," informing Clemons that it intended to pursue the death penalty.

On November 12, 2012, Clemons filed various pretrial motions, including a motion for change of venue and a motion to suppress his statement to the police. In his motion for a change of venue, Clemons maintained that the amount of pretrial publicity and negative online activity that was generated by the case made it "impossible for [Clemons] to receive a fair trial in Washington County." Omnibus Pretrial Motion, 11/12/2013, at 6 (unpaginated). In support of his claim, Clemons alleged the following:

23. The case at bar has received a tremendous amount of notoriety.

24. The case has been followed by televised news on all local stations, has been reported [] in the newspaper and has been argued about in social media. . . .

25. The relatives of Karissa Kunco have expressed their opinions on a website entitled "Rot in Hell Jordan Clemons". . . .

26. There is also "Karissa's Army" which has become vocal in the area. One of the recent activities sponsored by "Karissa's Army" was a [fundraiser] at Station Square where it was made public knowledge that Karissa Kunco was murdered by Jordan Clemons. . . .

27. The television show "Made" on October 15[,] 2012 aired on MTV, featured [an] individual whose favorite charity is a campaign against

domestic violence because one of her friends was murdered by Jordan Clemons. . . .

28. The Canon[-McMillan] School District held a "Demi Brae Cuccia Awareness Assembly" in April and guest speakers discussed the case and it was mentioned that Karissa Kunco was murdered by Jordan Clemons. The students then reported home and told their parents[,] all [of whom are] potential jurors[,] of the topic.

29. There is also a Karissa's Law website dedicated to proposed legislation on Domestic Violence. . . .

30. Unsolicited supporters of [Clemons] have also begun a racially motivated campaign on a website called Blackfootsoldier.com, on behalf of [Clemons] which in many ways could have a negative impact on the trial. . . .

*Id.* at 4-5. Clemons attached to his motion numerous documentary exhibits in support of these averments, including newspaper articles referencing the murder, posts from the "Rot in Hell Jordan Clemons" Facebook page, and racially charged online arguments from "Blackfootsoldier.com."

Clemons' case initially was assigned to the Honorable Katherine B. Emery, of the Court of Common Pleas of Washington County. On April 3, 2014, Judge Emery held a hearing on Clemons' motion for a change of venue. At the hearing, Clemons' counsel contended that this case had garnered more than the typical amount of media coverage, and, perhaps more importantly, had fostered social organization and action that had polluted the pool of potential jurors. Counsel pointed out that "Karissa's Army" held regular public events to discuss the case, including two such events in that particular month. Clemons' attorney also noted that the "Karissa's Army" Facebook page had 4,261 followers, a significant number in proportion to the population of Washington County. Finally, counsel expressed his concern that the attention and activity only would escalate as trial approached.

The Assistant District Attorney ("ADA") pointed out that Clemons' trial was scheduled to occur thirty months after the murder. The ADA argued that any impact of the pretrial activity would not affect a Washington County jury pool because Kunco was from Allegheny County, which is where most of the relevant activities occurred. Further, the ADA disputed Clemons' characterization of "Karissa's Army" as effectively an organization created to generate animosity toward Clemons. To the contrary, the ADA asserted, the group was focused on preventing domestic violence, not on inflicting vengeance upon Clemons.

By order and opinion dated April 23, 2014, Judge Emery denied Clemons' motion. In her opinion, Judge Emery outlined the governing legal principles and then examined whether the pretrial publicity outlined by Clemons created actual prejudice or was so sensational or inflammatory as to require prejudice to be presumed. Judge Emery first determined that she was unable to ascertain whether actual prejudice existed until the jury selection process commenced. Thus, she denied Clemons' motion on this particular point without prejudice to renewal of the issue during *voir dire*. Trial Ct. Op., 4/23/2014, at 3-4.

Judge Emery then reviewed the material submitted in conjunction with Clemons' motion in order to determine whether prejudice should be presumed. Judge Emery first examined the newspaper reports of the murder. She noted that the articles generally were factual and objective. Some of the articles mentioned the PFA that Kunco had obtained against Clemons, and some referenced Clemons' prior criminal record. Judge Emery concluded that "these scattered reports are not so extensive, sustained, and pervasive as to saturate the pool of potential jurors." *Id.* at 4. Even if these references were problematic, Judge Emery explained, there would be a sufficient "cooling-off period"

between the date of publication and the "yet-to-be scheduled trial." *Id.* Thus, Judge Emery held, the news articles did not require a presumption of prejudice.

Judge Emery then focused upon the "Rot in Hell Jordan Clemons" Facebook page, which, the judge acknowledged, required of a reader only a cursory review in order to determine that the participants on that page had predetermined Clemons' guilt. The page's users did not celebrate Kunco's life. Instead, they used the page to "direct and vent anger" toward Clemons. *Id.* "They are surely inflammatory and slanted towards conviction, though it is apparent that many of the commenting users were in some way connected to the victim through friends and family." *Id.* Despite the vitriol, Judge Emery did not find that this page, and the comments thereon, warranted a presumption of prejudice. First, the primary users would not be eligible jurors because of their connection to Kunco. Second, the Facebook page did not indicate whether the users and commenters resided in Washington County, from where the jury would be selected. Judge Emery observed that, because both Kunco and Clemons were Allegheny County residents, "it may be that the majority of these comments are from residents in that area," rather than from Washington County. *Id.* at 5. Accordingly, Judge Emery was not convinced that this page created publicity "so extensive, sustained, and pervasive to so [*sic*] saturate the communities of Washington County." *Id.*

Next, Judge Emery considered the impact that "Karissa's Army" had on the court's ability to empanel a fair and impartial jury in Washington County. Judge Emery characterized the group as one that "not only serves to share memories of [Kunco], but is also active in the community with attempts to educate the public on domestic violence." *Id.* The group maintained a Facebook page, conducted public events, and even had a member who appeared on an MTV show to state that her favorite charity was one that advocated efforts against domestic violence. A news article about that member's

appearance mentioned once that Clemons was accused of Kunco's murder. Judge Emery found that "the group's small web presence and brief reference on a television program" did not create publicity at a level that necessitated a change of venue. *Id.*

However, the group's public events concerned Judge Emery. "Without question, [Clemons] should not be referred [to] as the assailant unless he is convicted of that crime. An event held within this County or other matters that predetermine [Clemons'] guilt without trial have the potential to create prejudice within the community." *Id.* at 6 (footnote omitted). Because Clemons provided no details or specificity regarding any of the group's other public events, Judge Emery focused on the single domestic violence event cited, which occurred at Canon McMillan Senior High School. Judge Emery pointed out that, if a student went home and told a parent (and potential juror) about the event, and if the parent formed a fixed opinion about Clemons' guilt, that parent would be ineligible to serve on the jury. Thus, although the event may have created the *potential* for actual prejudice (an issue Clemons would have to take up at jury selection), nothing about the Canon McMillan event struck Judge Emery as so inflammatory or pervasive as to require the court to presume prejudice.

Finally, Judge Emery considered the "Blackfootsolidier.com" website, which the judge explained existed to promote a racist agenda and advocated that Clemons must be innocent because of nothing more than Clemons' and Kunco's respective racial identities. Although the website was plainly inflammatory and sensational, nothing presented in Clemons' averments or at the hearing convinced Judge Emery that the website had any discernible impact upon the pool of potential jurors in Washington County.

Consequently, Judge Emery concluded that the instances of publicity identified by Clemons did not mandate a presumption of prejudice, either individually or in the aggregate. Thus, Judge Emery denied the motion for a change of venue.

In his omnibus pretrial motion, Clemons sought to suppress the statement that he made to Trooper Schuster at the Pennsylvania State Police barracks. Clemons asserted that, based upon a number of factors, his statement was involuntary. First, he argued, he never waived his *Miranda* rights orally or via a written form. Second, Clemons alleged that he was intoxicated, fatigued, and suffering from a headache during his interaction with Trooper Schuster. Finally, maintained Clemons, after he made the statement, he asked for an attorney and the questioning stopped. According to Clemons, the combination of these three factors rendered his statement involuntary.

On May 16, 2014, Judge Emery held a hearing on Clemons' suppression motion. At the hearing, Trooper Wilson testified that, upon his arrival at the police barracks, Clemons smelled of alcohol and had bloodshot eyes. However, Clemons did not stumble or require assistance in exiting the vehicle when he surrendered. Nor did Trooper Wilson observe Clemons experience any difficulties in complying with police directives as he was patted down and escorted to an interview room. Clemons spoke quietly, but did not slur or mumble.

Trooper Schuster also testified at the suppression hearing. Though he too detected the odor of alcohol emanating from Clemons, he recalled as well that Clemons did not exhibit a staggered gait or manifest any inability to comprehend the procedures due to intoxication. Once Clemons was seated in an interview room, Trooper Schuster asked whether he needed anything. Clemons replied only that his head was hurting. Trooper Schuster then informed Clemons that he was under arrest for Kunco's murder. He provided Clemons the standard *Miranda* warnings. Trooper Schuster also told Clemons that, if he waived his right to remain silent, he could reverse that decision at any point. In response to the warnings, Clemons neither acknowledged that he understood his rights nor affirmatively indicated his intention to waive them. Instead, Trooper

Schuster testified, Clemons spontaneously stated that, "he just wanted to let us know that we had it all wrong, that when he saw the news, he did not kidnap the victim, and you could see by the Facebook postings, that she met with him or picked him up on top of Maytide under her own free will." N.T., Suppression Hearing, 5/16/2014, at 25. Trooper Schuster told him that they were interested in hearing Clemons' side of the story. Clemons explained briefly that, after Kunco picked him up, they went to a PNC Bank branch. At some point thereafter, they got into an argument and Kunco punched him in the head. Clemons asserted that those events were all that he could remember about the evening in question.

Trooper Schuster asked Clemons to sign a waiver of his constitutional rights as outlined in the *Miranda* warnings. Clemons refused to sign the form and then invoked his right to counsel. Trooper Schuster ended the interview at that point. Trooper Schuster testified that Clemons did not slur his speech nor mispronounce his words during the brief interrogation.

Clemons called his mother (Thorpe) to testify as a witness on his behalf at the suppression hearing. Thorpe recounted the phone conversations and interactions that she had with Clemons on January 12, 2012. She testified that Clemons was "slurred, slow, muted personality, snappy." *Id.* at 46. Thorpe testified that Clemons' "whole demeanor was down," and that he smelled of alcohol and an odor of smoke that she could not identify other than that it was not the smell of cigarette smoke. *Id.* at 49. Based upon these observations, Thorpe believed that Clemons was high or intoxicated. In fact, in one phone conversation, Clemons told her that he was high and that he intended to obtain and ingest more drugs throughout the day.

Thorpe's brother, Commodore Perry Kemp, testified that he flew back from Georgia with Thorpe when Thorpe learned that Clemons was implicated in Kunco's

murder. Kemp was in the car with Clemons when Thorpe drove him to surrender. Kemp observed that Clemons smelled of alcohol, and that his behavior was out of character. Kemp believed that Clemons was intoxicated.

Melanie Davis, Clemons' pastor, also testified. She explained that she picked Thorpe up at the airport on January 12, 2012. She drove with Thorpe to pick up Clemons at Robert's house. When they entered the residence, Pastor Davis noted that Clemons was sitting slumped down on the couch. His eyes were bloodshot and he smelled of alcohol. Pastor Davis testified that the odor of alcohol was so strong that she provided Clemons chewing gum to mute the scent.

Following briefing from the parties, in an order and opinion dated July 15, 2014, Judge Emery rejected Clemons' contentions that he did not actually waive his constitutional rights and that, if he did, the decision was involuntary in light of his level of intoxication. As to the former, Judge Emery first found, as a matter of fact, that Trooper Schuster administered *Miranda* warnings to Clemons and asked Clemons only whether he would waive his constitutional rights. Instead of responding to that question, Clemons volunteered a statement pertaining to how the police "had it all wrong." Trial Ct. Op., 7/15/2014, at 3-4. The "statement[ was] unsolicited and made with no obligation." *Id.* at 4. Thus, the question for Judge Emery became whether Clemons' utterance of that statement constituted an intent to waive his constitutional rights. Judge Emery resolved this inquiry as follows:

> This Court finds that [Clemons] did manifest a desire to waive his right to remain silent. At no time did he express any confusion after the officer had explained his rights. Further, no question about the victim's death was ever posed to him. [Clemons] freely volunteered his statements. Only upon the request to sign the waiver did he invoke his right to an attorney. Doing so demonstrated that [Clemons] was aware of his rights and, while willing to waive his right to remain silent, he wished to invoke his right to counsel. Based on these facts, [this Court] cannot find that [Clemons] understood

only one of the rights explained to him. Accordingly, this Court finds that [Clemons] manifested a desire to waive his right to remain silent.

*Id.* at 4-5.

Judge Emery then turned her attention to Clemons' claim that he was too intoxicated to voluntarily waive his constitutional rights. Judge Emery determined that, although Clemons was intoxicated (voluntarily), he was not so inebriated that his decision to utter a statement to the police was involuntary. The judge highlighted the facts that Clemons was able to walk without assistance, to understand and respond to the questions posed to him, and to invoke his right to counsel. Consequently, Judge Emery denied Clemons' suppression motion.

## H. Trial and Sentencing

Eventually, Clemons' case was transferred to the Honorable Gary Gilman for trial. Jury selection began on March 11, 2015, and ended on March 24, 2015. During *voir dire*, Clemons did not renew his motion for a change of venue based upon actual prejudice.

The guilt phase of Clemons' capital trial began on May 4, 2015. The Commonwealth and Clemons presented a substantial amount of testimony and evidence, which established the facts summarized above. At the conclusion of the evidence, Clemons requested that Judge Gilman instruct the jury on "voluntary intoxication or drug condition as a defense to first-degree murder." N.T., Vol. V., 5/11/2015, at 4. Pennsylvania's suggested standard instruction in this regard reads as follows:

8.308B (Crim) Voluntary Intoxication or Drugged Condition as Defense to First-Degree Murder

1. I'll begin with some general rules about [intoxication] [drugged conditions]. Generally speaking, a person who voluntarily used [intoxicants] [drugs] is not allowed to claim as a defense that he or she was so [intoxicated] [drugged] that he or she was legally incapable of committing a crime. Nor is the person allowed to rely on evidence of his or her own

[intoxication] [drugged condition] to prove that he or she lacked an intent, knowledge, or other mental state required for a particular crime.

2. These general rules do not apply to a charge of first-degree murder. The defendant is permitted to claim as a defense that he or she was so overpowered by [intoxicants] [drugs] that the defendant had lost control of his or her faculties and was incapable of forming the specific intent to kill required for first-degree murder.

3. The Commonwealth has the burden of disproving this defense. Thus, you cannot find the defendant guilty of first-degree murder unless you are satisfied beyond a reasonable doubt that the defendant, despite any [intoxicated] [drugged condition], was at the time capable of forming a specific intent to kill and did in fact form that intent. [As I told you earlier, a specific intent to kill means [a conscious, fully formed intention to kill] [description].]

4. Voluntary [intoxication] [drugged condition] may reduce a murder from first-degree to third-degree but no lower. The general rules apply to lesser crimes. They prevent a defendant from using his or her own voluntary [intoxication] [drugged condition] in any way to defend himself or herself against an accusation of third-degree murder [voluntary manslaughter] [name all other charged crimes or lesser included offenses that are in issue].

8.308B (Crim) Voluntary Intoxication or Drugged Condition as Defense to First-Degree

Murder, Pa. SSJI (Crim), § 8.308B.

Judge Gilman rejected Clemons' request for this instruction. The judge explained his reasoning for doing so on the record, as follows:

I did decide that I would not permit [the defense and instruction], and it's really based upon the case of *Commonwealth v. Reiff*, [413 A.2d 672 (Pa. 1980)], and in that case, the Supreme Court upheld the trial Court for not permitting the intoxication defense, and I thought there were some very similar facts in that case to this case.

Specifically, in that case, this defendant went drinking at a saloon and drank approximately two-and-a-half quarts of beer during a certain period of time, and then he leaves and he goes out and kills somebody. And in that case the Court found it important that there was no evidence that the appellant ingested intoxicants after leaving the saloon because there was testimony that the appellant, the defendant in that case, exhibited "no signs of intoxication and that there was nothing unusual about appellant's behavior."

> That being said, and there was no evidence of when -- as I said, there was no evidence that the appellant ingested any intoxicants after leaving Kacy's Saloon.
>
> In this case, we don't know when Mr. Clemons ingested, assuming he did, we don't. This could have taken place before, it could have taken place after the death, and the most recent testimony of someone seeing him after she passed away, Miss Kunco passed away, is that he was not. So combined with the testimony of, that would be Mr. Taylor, indicating that Mr. Clemons seemed normal to him and the fact that we clearly don't know, assuming he did, have intoxicants, we don't know when it happened.
>
> So for that reason, I'm not allowing it.

N.T., Vol. V, 5/11/2015, at 3-4.

During closing arguments, Clemons did not deny that he killed Kunco. Instead, through counsel, he urged the jury to consider whether the Commonwealth had proven that he had acted with specific intent to kill. Clemons focused upon gas station attendant Leah-Ann Andrews' testimony that he appeared nervous and fidgety around the time of the murder. He pointed to the nature of the car crash, which he maintained indicated that he was not functioning with a sound and sober mind. He highlighted for the jury the empty beer cans, Chore Boy, and empty baggie with white residue located at the scene of the crash. Taken together, Clemons argued, these factors demonstrated that he was not capable of forming a specific intent to kill. Consequently, Clemons implored the jury to find that the Commonwealth had failed to prove that Clemons killed Kunco willfully and with premeditation, a failure that would necessitate a verdict of third-degree murder, rather than first-degree. Following instructions and deliberations, the jury rejected Clemons' arguments and convicted him of first-degree murder, aggravated assault, abuse of a corpse, tampering with evidence, and access device fraud.[4]

---

[4]     Clemons was acquitted of the second count of access device fraud and a count of unauthorized use of automobiles

On May 12, 2015, the penalty phase of the trial commenced. After evidentiary presentations, the jury unanimously found two aggravating factors: (1) "The defendant has a significant history of felony convictions involving the use or threat of violence to the person," *see* 42 Pa.C.S. § 9711(d)(9);[5] and (2) "At the time of the killing the defendant was subject to a court order restricting in any way the defendant's behavior toward the victim pursuant to 23 Pa.C.S. Ch. 61 (relating to protection from abuse) or any other order of a court of common pleas or of the minor judiciary designed in whole or in part to protect the victim from the defendant." *Id.* § 9711(d)(18). One or more jurors found two mitigating factors: (1) Clemons' mentally and physically abusive childhood; and (2) Clemons' drug and alcohol history.[6] The jury unanimously found that the aggravating circumstances outweighed any mitigating circumstance. N.T., Vol. VIII, 5/14/2015, at 82-83. Consequently, the jury recommended that Clemons be sentenced to death.

On May 15, 2015, Judge Gilman formally sentenced Clemons to death on the first-degree murder conviction. Judge Gilman further sentenced Clemons to an aggregate term of twenty-one to forty-two months' incarceration on Clemons' remaining convictions, to run concurrently with the death sentence.

## I. Post-Sentence Motions and Pa.R.A.P. 1925

---

[5]     During the penalty phase, the Commonwealth introduced evidence that, as a juvenile, Clemons had been adjudicated delinquent for aggravated assault, and, that, as an adult, he had pleaded guilty in two separate robberies. N.T., Vol. VI, 5/12/2015, at 24-32.

[6]     The jury rejected the following proposed mitigating factors: (1) that Clemons was under the influence of extreme emotional or mental disturbance; (2) that Clemons' capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired; (3) Clemons' age at the time of the crime; (4) Clemons' family and extended familial relationships; (5) Clemons' brain injury and cognitive functioning; and (6) Clemons' loss of his brother in 2001. N.T., Vol. VIII, 5/14/2015, at 83-84.

On May 22, 2015, Clemons filed timely post-sentence motions. Clemons also sought an extension of ten days to amend the motions, which the trial court granted. On May 29, 2015, Clemons filed his amended post-sentence motions. Therein, Clemons raised a multitude of issues, only some of which are material to this direct appeal. Clemons maintained that: (1) the Commonwealth's evidence was insufficient to prove him guilty of first-degree murder; (2) the verdict was against the weight of the evidence; and (3) the trial court erred by (a) denying his motion for a change of venue; (b) admitting into evidence photographs depicting the injuries sustained by Kunco that prompted her to obtain the PFA; and (c) rejecting Clemons' request for a voluntary intoxication jury instruction. On April 17, 2017, following numerous delays and extensions in order to allow the parties to file briefs and to conduct an evidentiary hearing on an issue that no longer is part of this case, Judge Gilman denied Clemons' post-sentence motions by order and opinion.[7]

On May 4, 2017, Clemons filed a notice of appeal. The trial court did not direct Clemons to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and he did not file one. On July 25, 2017, the court issued a statement pursuant to Pa.R.A.P. 1925(a) in which it adopted its April 17, 2017 opinion issued in

---

[7] Typically, post-sentence motions must be decided by a trial court within one hundred and twenty days (or within one hundred and fifty days if the defendant seeks, and is granted, a thirty-day extension pursuant to Pa.R.Crim.P. 720(B)(3)(b)). If the court takes no action within that time period, the motions automatically are deemed denied by operation of law. Pa.R.Crim.P. 720(B)(3)(a). However, Pa.R.Crim.P. 811 exempts post-sentence motions filed after the imposition of a death sentence from Rule 720's time parameters. Rule 811 counsels trial courts to decide such motions "promptly" but specifically prohibits automatic denials by operation of law in capital cases.

In this case, the Washington County Clerk of Courts initially entered an order denying Clemons' post-sentence motions by operation of law. However, on December 14, 2015, the Clerk of Courts vacated that order pursuant to Rule 811.

support of its denial of Clemons' post-sentence motions as its opinion for purposes of Rule 1925(a).

## II. Issues

1. Did the trial court err when it failed to grant [] Clemons' motion in arrest of judgment?

2. Did the trial court err when it failed to grant [] Clemons' motion for a new trial?

3. Did the trial court err by failing to properly charge the jury, during the guilty phase of the trial, when it denied [] Clemons' request for an instruction on voluntary intoxication?

4. Did the trial court err when it failed to transfer venue due to pretrial publicity?

5. Did the trial court err when it failed to suppress the statements of the defendant in violation of his right to remain silent and his right to counsel under the Pennsylvania and United States Constitutions?

6. Did the trial court err when it failed to exclude prejudicial evidence?

Brief for Clemons at 5 (capitalization modified; issues reordered for ease of disposition).

## III. Sufficiency of the Evidence

In the unique circumstance of capital direct appeals, we are obliged independently to evaluate the sufficiency of the evidence so as to determine whether the Commonwealth proved the defendant guilty of first-degree murder. *Commonwealth v. Montalvo*, 956 A.2d 926, 932 n.5 (Pa. 2008) (citing *Commonwealth v. Zettlemoyer*, 454 A.2d 937 (Pa. 1982)).

Evidence legally is sufficient when, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to enable a reasonable fact-finder to find all of the elements of first-degree murder beyond a reasonable doubt. *Commonwealth v. Johnson*, 985 A.2d

915, 920 (Pa. 2009) (quoting *Commonwealth v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008)). In conducting this inquiry, we must evaluate the entire trial record. *Commonwealth v. Cousar*, 928 A.2d 1025, 1032-33 (Pa. 2007). In addition, "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence." *Id.* at 1033.

> In the case of first-degree murder, a person is guilty when the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. 18 Pa.C.S. § 2502(d); *Commonwealth v. Spotz*, 759 A.2d 1280, 1283 (Pa. 2000). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Rivera*, 773 A.2d 131, 135 (Pa. 2001).

*Commonwealth v. Blakeney*, 946 A.2d 645, 651-52 (Pa. 2008) (citations modified).

At all relevant times, Clemons conceded that he killed Kunco. *See* Brief for Clemons at 31. Putting this concession aside, our independent review demonstrates that the record is replete with evidence proving that Clemons was the perpetrator of the murder. The events that led to Kunco's death commenced on January 10, 2012 with a Facebook conversation between Clemons and Kunco, during which Clemons persuaded Kunco to meet him on January 11. Having been a victim of Clemons' violence, Kunco repeatedly asserted that she was afraid of Clemons and that her family would be upset if she met with him. Nonetheless, on the night of January 11, she drove her vehicle into Pittsburgh and picked up Clemons. As the night progressed, Clemons drove around Washington County attempting to use Kunco's and Kunco's father's debit cards at various banks and stores. Surveillance footage and eyewitness testimony established that Clemons was driving Kunco's vehicle to these locations.

On the morning of January 12, 2012, Clemons crashed Kunco's vehicle into a tree on Gladden Road in Cecil Township. He called Taylor for assistance. Clemons was crying, and stated, "I'm sorry, I'm sorry. She's dead." N.T., Vol. II, 5/5/2015, at 157. Later that day at the Pennsylvania State Police barracks, Clemons admitted to being with Kunco the night before. When Clemons made this statement, he was wearing shoes splattered with droplets of dried blood, later identified through DNA testing as Kunco's. All told, the trial evidence amply proved beyond a reasonable doubt that Clemons was the person who killed Kunco.

What remains is the question of whether the trial evidence proved beyond a reasonable doubt that Clemons specifically intended to kill Kunco. Clemons contends that the Commonwealth failed to prove that he acted with premeditation, and, thus, with the specific intent to kill required for murder in the first degree. Clemons maintains that the Commonwealth's "entire argument for premeditation hinge[d] on a Facebook conversation that occurred prior to the murder." Brief for Clemons at 31. According to Clemons, the Commonwealth's position is that Clemons used Facebook to lure Kunco to him for the sole purpose of killing her. However, Clemons insists that this is not true, as evidenced by the absence of threats within that conversation. As such, Clemons maintains, the jury's conclusion as to premeditation could only be the product of "mere conjecture or surmise." *Id.* at 32.

We find Clemons' argument unpersuasive. Even if the Commonwealth failed to prove that the Facebook conversation was, in fact, a ruse that Clemons employed to draw Kunco to him so that he could kill her, there was substantial other evidence from which the jury could conclude that Clemons' actions were premeditated, deliberate, and conducted with the specific purpose of causing Kunco's death. The most prominent evidence in this regard was Clemons' use of a sharp object to slash Kunco's throat from

one side to the other. The cut was so deep that it sliced all the way to Kunco's spine, causing extensive bleeding and a rapid death. Because specific intent may be inferred by the use of a deadly weapon upon a vital part of a victim's body, *Rivera*, 773 A.2d at 135, we have little difficulty in concluding that Clemons specifically intended to kill Kunco.

Furthermore, the "law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second." *Commonwealth v. Jordan*, 65 A.3d 318, 323 (Pa. 2013). "Whether the intention to kill and the killing, that is, the premeditation and the fatal act, were within a brief space of time or a long space of time is immaterial if the killing was in fact intentional, willful, deliberate and premeditated." *Commonwealth v. Earnest*, 21 A.2d 38, 40 (Pa. 1941). Because the evidence here clearly established that, at the time of the actual murder, Clemons acted with specific intent to kill, it does not matter whether the Commonwealth proved that the Facebook conversation constituted the premeditation for Kunco's murder. There was other, and ample, evidence of specific intent.

Having completed our independent review of the evidence, we conclude that the record was more than sufficient to sustain Clemons' first-degree murder conviction. This subsumes our consideration of Clemons' first issue, which concerns the trial court's failure to grant Clemons an arrest of judgment upon the basis of insufficient evidence.

### IV. Weight of the Evidence

Clemons next contends that the verdict was against the weight of the evidence. "When a trial court evaluates a weight of the evidence claim, the trial court may award relief only "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013)

(citations omitted). On appeal, the inquiry differs. When it considers a weight claim, an appellate court must review the trial court's exercise of discretion. "A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." *Id.* "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Id.* at 1055. We do not contemplate the underlying question of whether the verdict actually was against the weight of the evidence. *Id.* at 1055. Rather, we evaluate the trial court's decision of that issue, and we do so under an abuse of discretion standard. *Id.*

The jury is the ultimate fact-finder and the sole arbiter of the credibility of each of the witnesses. "Issues of witness credibility include questions of inconsistent testimony and improper motive." *Commonwealth v. Sanchez*, 36 A.3d 24, 39 (Pa. 2011) (citation omitted). A jury is entitled to resolve any inconsistences in the Commonwealth's evidence in the manner that it sees fit. *See Commonwealth v. Rivera*, 983 A.2d 1211, 1220 (Pa. 2009) (stating that "the trier of fact, in passing upon the credibility of witnesses, is free to believe all, part, or none of the evidence") (citation omitted).

Clemons argues that the weight of the trial evidence did not support the Commonwealth's theory that it was Clemons who killed Kunco in the backseat of her car. At trial, Coroner Warco and Dr. Shakir both testified that the type of wound inflicted upon Kunco would have resulted in the loss of a large amount of blood. Their predictions proved to be true. The backseat of Kunco's vehicle was saturated with blood. Investigators also found significant pooling of blood underneath the seat. Clemons takes no issue with the Commonwealth's assertion that Kunco was killed in the backseat. Instead, he argues that the weight of the evidence did not support the conclusion that it was he who killed Kunco there. Clemons posits that one would expect Clemons to be

covered in blood due to the nature of the injury, the amount of blood expected to result from such a wound, and the actual amount of blood found in the car. The police found only a few droplets of dried blood on Clemons' shoes. No one testified that Clemons changed clothes at any time. Neither Taylor, nor Samantha Rush, nor Robert, each of whom saw Clemons shortly after the murder, testified that he or she observed blood on Clemons or on his clothing. The police never found bloody men's clothing. Clemons concludes by asserting that the "determination that [] Clemons committed a homicide that was extremely bloody, according to testifying experts, without copious amounts of blood on [] Clemons['] person or clothing, shocks the [conscience] and calls for this Court to order a new trial." Brief for Clemons at 33.

The trial court denied Clemons' weight of the evidence challenge. We discern no abuse of the trial court's discretion. Effectively, Clemons is arguing that the jury should have determined that he was not the perpetrator of the murder because, had he been the killer, he would have been covered in Kunco's blood instead of having just a few drops of her blood on his shoes. This argument is especially unavailing inasmuch as Clemons has at all times admitted to killing Kunco. *See* Brief for Clemons at 31 ("Mr. Clemons, from the outset of his trial, conceded that he had killed the victim. . . ."). It hardly can be maintained that the jury's verdict was against the weight of the evidence in view of the fact that the jury accepted what Clemons admitted.

Moreover, as noted above, there was substantial independent evidence to prove that Clemons was the perpetrator of the murder, including the presence of Kunco's blood on Clemons' shoes at the time that he was arrested for her murder. Clemons confessed to being with Kunco on the night of the murder. Clemons solicited Kunco's companionship on Facebook, used her bank card, drove her car into a tree, and told Taylor that she was dead. As the finder of fact and the arbiter of credibility, the jury was free to determine that

the evidence proving that Clemons was the perpetrator of the crime outweighed the absence of blood on the remainder of Clemons' clothes, especially in light of the fact that Clemons conceded that he killed Kunco. The trial court acted well within its discretion when it denied Clemons' request for a new trial on the basis of a weight of the evidence claim.

## V. Voluntary Intoxication Jury Instruction

In his third issue, Clemons asserts that the trial court erred in denying Clemons' request for a voluntary intoxication jury instruction. To this end, Clemons asserts that the trial court relied erroneously upon this Court's decision in *Commonwealth v. Reiff*, 413 A.2d 672 (Pa. 1980), applied an incorrect standard of review, focused upon irrelevant evidence, and ignored more probative evidence of Clemons' intoxication. Brief for Clemons at 16-23. We find no merit in Clemons' assertions, and we find no abuse of discretion by the trial court.

We begin with the legal standards that govern Clemons' claim. Because it was undisputed at trial that Clemons was the person who killed Kunco, the "only meaningful defense that Mr. Clemons could advance . . . was one of diminished capacity at the time of the incident." *Id.* at 16. "A defense of diminished capacity negates the element of specific intent, and thus mitigates first-degree murder to third-degree murder." *Commonwealth v. Padilla*, 80 A.3d 1238, 1263 (Pa. 2013) (citing *Commonwealth v. Williams*, 980 A.2d 510, 527 (Pa. 2009); *Commonwealth v. Saranchak*, 866 A.2d 292, 299 (Pa. 2005)). The fact that the record contains some evidence that the defendant consumed an intoxicant will not suffice to justify a diminished capacity instruction. *Padilla*, 80 A.3d at 1263. A defendant is entitled to the instruction only when he "was overwhelmed to the point of losing his faculties and sensibilities." *Id.* (citing *Blakeney*,

946 A.2d at 653; *Commonwealth v. Spotz*, 896 A.2d 1191, 1218 (Pa. 2006)); *see also Reiff*, 413 A.2d at 674 (explaining that a voluntary intoxication instruction is justified only when there is evidence that the defendant was "overwhelmed or overpowered by alcoholic liquor to the point of losing his . . . faculties or sensibilities").

In this case, the trial court concluded that Clemons did not demonstrate that the evidence of record compelled the instruction, particularly because there was no evidence that Clemons was sufficiently intoxicated at the time of the murder so as to implicate the defense. *See* N.T., Vol. V, 5/11/2015, at 3-4. We review the trial court's decision to deny the voluntary intoxication instruction for an abuse of discretion. *Commonwealth v. Johnson*, 107 A.3d 52, 89 (Pa. 2014).

There is ample testimony in this case to prove that, at some point, Clemons had ingested drugs, alcohol, or both. Every person who came into contact with Clemons on January 12, 2012 testified that Clemons either was intoxicated, smelled of alcohol, exuded a smoky odor that was not consistent with cigarette smoke, had bloodshot eyes, or exhibited some combination of these symptoms. The problem for Clemons is that these indicators of intoxication were observed more than twenty-four hours after Kunco picked Clemons up in Pittsburgh, and a significant time after Kunco was murdered. This evidence is not relevant to the question of whether Clemons was overpowered by an intoxicant at the time of the murder.

There was evidence of drugs and alcohol at the crash scene on Gladden Road. But that evidence did not rise to the level of proof necessary to mandate a trial court instruction on voluntary intoxication. Specifically, Corporal Hunter found three Coors Light beer cans scattered among the leaves near where the vehicle came to rest. These cans prove little. Although the cans were empty, there was no proof that Clemons had consumed the beer inside those cans. One can had a puncture hole in the side. Another

was sealed at the top. That can was dented on the side, which had allowed the beer to drain out, rendering it unlikely that someone had consumed that beer. Regardless of the condition of the cans, it remains clear that no evidence at trial established that Clemons consumed the beers. More importantly, even if he did drink them, nothing in the record supports the notion that doing so rendered Clemons so intoxicated that he lost control of his faculties. *See Commonwealth v. Tilley*, 595 A.2d 575, 580 (Pa. 1991) (holding that consumption of beer on the day of a murder, and even appearing drunk to friends on that day, was not enough to require the instruction; evidence still had to prove that the defendant was overpowered by the intoxication to such an extent that he was incapable of forming the specific intent to kill).

Corporal Hunter also found a butane lighter, a piece of Chore Boy, and a baggie containing white residue near or inside the vehicle. There is no doubt that these items are suggestive of drug use. However, they suffer the same evidentiary inadequacies as the Coors Light cans. Without some nexus between these items, Clemons, and the point in time at which Kunco was murdered, there is no record-based justification for concluding that Clemons had ingested drugs at the time of the killing and, further, that such drugs overtook Clemons to a degree that his specific intent should be negated.

We have conducted an independent review of the lengthy trial record. We have found no evidence, introduced by either party, to suggest that Clemons was so "overwhelmed or overpowered by alcoholic liquor [or drugs] to the point of losing his . . . faculties or sensibilities." *Reiff*, 413 A.2d at 674. Hence, the trial court did not abuse its discretion in rejecting Clemons' request for a voluntary intoxication instruction.

We turn now to Clemons' specific arguments on this point. First, Clemons asserts that the trial court relied erroneously upon *Reiff*. Clemons maintains that the court should have based its ruling instead upon our decision in *Padilla*. In *Reiff*, trial testimony

established that Reiff had consumed two and one-half quarts of beer in the hours before he killed the victim. *Reiff*, 413 A.2d at 673. However, Reiff exhibited no signs of intoxication and did not act in an unusual manner. Because there was insufficient evidence of intoxication in the record, we found no error in the trial court's refusal to instruct the jury on voluntary intoxication. *Id.* at 674.

In *Padilla*, Padilla sought a voluntary intoxication instruction based solely upon his consumption of drugs and alcohol. The trial court refused to instruct the jury in that manner, telling the jury that there was no evidence that the consumption of drugs and alcohol overwhelmed Padilla to the point that he was incapable of forming a specific intent to kill. *Padilla*, 80 A.3d at 1267. However, the trial court instructed the jury that it could consider drug and alcohol consumption "together with all the other evidence in the case to determine if the Commonwealth met it's [*sic*] burden of proving specific intent[.]" *Id.* On direct appeal, we approved the trial court's instructions.

Clemons maintains that the trial court should have given a *Padilla*-like instruction, and that he should have been able to argue to the jury that drug and alcohol usage should be considered as a factor in assessing whether the Commonwealth met its burden. Instead, according to Clemons, the trial court relied erroneously upon *Reiff* and denied him the opportunity to argue diminished capacity at all. We are unconvinced. First, it is not clear that Clemons made this argument to the trial court in the first instance. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Second, and more importantly, the trial court did not abuse its discretion by relying upon *Reiff*. The lesson of that case is simple. If there is no evidence to demonstrate that the defendant was so overwhelmed by an intoxicant that he or she could not control his or her faculties and sensibilities, then the defendant is not

entitled to the instruction. As explained at length above, no such evidence is of record in this case.

Nothing about *Padilla* changed this general rule. In fact, *Padilla* cited *Reiff* as part of the governing legal paradigm. Moreover, we did not hold in *Padilla* that a defendant asserting voluntary intoxication is entitled to a *Padilla*-like instruction in every circumstance. We merely held in that case that the instruction provided by the court conformed to the expert testimony and circumstances of that particular trial, and did not constitute reversible error on that record. We did not create a new general rule applicable to any defendant who seeks to argue voluntary intoxication.

Next, Clemons argues that the trial court employed an incorrect standard of review in determining whether to issue the instruction. In part, the trial court relied upon Taylor's testimony that Clemons did not appear to be intoxicated when he and Rush picked Clemons up on Gladden Road. Clemons asserts that, during cross-examination, Taylor also stated that he could not definitively say that Clemons was not intoxicated. Because this statement conflicted with Taylor's testimony on direct examination, Clemons argues, the trial court was forced to weigh the testimony, which is not the court's role in deciding whether to issue a jury instruction. Clemons stresses that a trial court must construe the evidence in the defendant's favor when contemplating jury instructions. *See Commonwealth v. Robinson*, 721 A.2d 344, 353 (Pa. 1998). Thus, argues Clemons, in considering Taylor's direct examination statement that Clemons was not intoxicated, while disregarding Taylor's equivocation under cross-examination, the trial court employed an analysis that was structurally flawed.

Clemons is correct that Taylor's testimony under cross-examination varies slightly from his statements on direct examination. On direct, Taylor stated that Clemons did not seem intoxicated at any time on January 12, 2012. N.T., Vol. II, 5/5/2015, at 165. On

cross-examination, Taylor reiterated that Clemons did not appear to be intoxicated when Taylor and Rush picked him up on Gladden Road. *Id.* at 169. However, when asked whether it was possible that Clemons was intoxicated, Taylor replied, "maybe." *Id.* This statement reflected Taylor's acknowledgement that it was possible that his assessment of Clemons was wrong. But Taylor did not waver from his belief that Clemons was not actually intoxicated. That he admitted that he could be wrong was not the same as changing his substantive testimony, a circumstance that would have required the trial judge to make credibility findings. Inasmuch as the trial court was not required to weigh the testimony, it did not misapply the governing standard of review.

Next, Clemons argues in the alternative that the trial court should not have relied upon Taylor's testimony at all in determining whether to provide the voluntary intoxication instruction. Clemons notes that the relevant inquiry is whether an accused was intoxicated at the time of the murder. Taylor was not present for the murder. He observed Clemons only after Kunco had been killed. The time of the murder was not established with any level of clarity at trial. By the time Taylor interacted with Clemons, twelve hours may have elapsed since the murder. Thus, Clemons contends, Taylor's testimony provides little, if any, insight into the actual inquiry of Clemons' level of intoxication at the time of Kunco's death.

The flaw in Clemons' argument is that, even if the trial court omitted any reference to or discussion of Taylor's observations, Clemons still would not be entitled to the instruction. Taylor's belief that Clemons was not drunk when Taylor picked Clemons up on Gladden Road does not alter the fact, as outlined above, that the record is devoid of any evidence proving that Clemons actually ingested any intoxicants, that he did so before he killed Kunco, or that he was so intoxicated that he could not form the specific

intent to kill. Perhaps Clemons is correct that Taylor's testimony is irrelevant to the calculus. But Clemons nonetheless was not entitled to the instruction.

Finally, Clemons asserts that the trial court abused its discretion when it found no evidence to support issuance of the instruction. Clemons argues that the trial court ignored the Coors Light cans and the drug paraphernalia. This evidence, Clemons maintains, "creates reasonable support that Mr. Clemons may have been intoxicated at the time of the offense." Brief for Clemons at 24. However, as discussed at length above, there is no evidence in the record to suggest that Clemons drank the beers or used any drugs, let alone that he did so before killing Kunco or that the intoxicants overpowered him to the degree that he lost control of his faculties.

For these reasons, we find no basis to conclude that the trial court abused its discretion by denying Clemons' request for a voluntary intoxication/diminished capacity jury instruction.

## VI. Motion for Change of Venue

In his fourth issue, Clemons contends that the trial court abused its discretion when it denied his pretrial motion to transfer the case out of Washington County due to the purportedly inflammatory pretrial publicity. A decision disposing of a motion for a change of venue "rests within the sound discretion of the trial judge, whose ruling thereupon will not be disturbed on appeal absent an abuse of that discretion." *Commonwealth v. Marinelli*, 690 A.2d 203, 213 (Pa. 1997). The trial judge is afforded wide latitude in assessing the impact that pretrial publicity has on a particular case because he or she "is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change." *Commonwealth v. Tharp*, 830 A.2d 519, 529 (Pa. 2003).

"A change in venue becomes necessary when the trial court concludes that a fair and impartial jury cannot be selected in the county in which the crime occurred." *Commonwealth v. Karenbauer*, 715 A.2d 1086, 1092 (Pa. 1998). Normally, this means that a defendant seeking a change in venue must show that the pretrial attention caused actual prejudice by preventing the trial judge from empaneling an impartial jury. *Commonwealth v. Briggs*, 12 A.3d 291, 313 (Pa. 2011) (citing *Commonwealth v. Robinson*, 864 A.2d 460, 484 (Pa. 2004)).

In addition to actual prejudice, this "Court has recognized that there are some instances in which pretrial publicity can be so pervasive and inflammatory [that] a defendant does not have to prove actual prejudice." *Id.* at 314. In such instances, prejudice will be presumed if the defendant can establish that the pretrial publicity: "(1) was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) derived from official police or prosecutorial reports." *Tharp*, 830 A.2d at 529; *Commonwealth v. Weiss*, 776 A.2d 958, 964 (Pa. 2001).

Satisfaction of one (or more) of these factors does not automatically entitle a moving defendant to relief. "A change of venue [] is not warranted unless [the defendant] also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated." *Karenbauer*, 715 A.2d at 1092.

Clemons first raised his request for a change of venue in an omnibus pretrial motion. Finding that no presumption was warranted at the time, the trial court denied the motion without prejudice to raise the prospect of actual prejudice once jury selection

began. However, Clemons did not reassert the issue, foregoing the opportunity to demonstrate that the pretrial publicity inhibited his ability to select a fair and impartial jury upon the basis of actual prejudice. Consequently, our inquiry is limited to the trial court's exercise of its discretion in determining that the nature and extent of the publicity did not necessitate a presumption of prejudice. We discern no abuse of that discretion.

Presently, in arguing that prejudice should be presumed, Clemons focuses, *inter alia*, upon the following instances of pretrial publicity, each of which he maintains touches upon the three prejudice factors:

- A February 1, 2012 article from the *Canon-McMillan Patch* that reported that Clemons had stated, "I'm sorry, I'm sorry, I'm sorry, she's dead";

- A KDKA news report that aired on January 12, 2012, during which Baldwin Borough Police Chief Michael Scott stated that "[t]here had been a problem with domestic violence between the two in the past." Chief Scott also noted that Clemons had a criminal history, had previously possessed weapons, and had fought with police;

- A January 13, 2012 KDKA news report in which Pennsylvania State Police Trooper Joseph Christy was quoted as stating, "[t]here is a possibility that the young lady was abducted by him and or just with him; and obviously, now that she has been found deceased, you can draw your own conclusion;"

- The existence and public activism of "Karissa's Army," "a group dedicated to domestic violence reform in memory of Ms. Kunco";

- A petition to reform Pennsylvania's domestic violence laws in Kunco's memory; and

- The website and online forum maintained by "National Blackfoot Soldier [*sic*]."

Brief for Clemons at 25-27.

Our survey of these items, as well as our comprehensive review of the pretrial record in this case, supports some of Clemons' general assertions. Within the pretrial publicity relied upon by Clemons are statements by police officials, references to

Clemons' prior criminal activities, and reproduction of Clemons' incriminating statements, all of which touch upon the three factors that raise a presumption of prejudice. "Karissa's Army" primarily was created to celebrate Kunco's life and to advocate for reformation of domestic violence laws. However, on the group's Facebook page, some users expressed contempt for Clemons. At the time that Clemons filed his pretrial motion, the "Karissa's Army" Facebook page had over four thousand viewers. The petition to reform Pennsylvania's domestic violence laws that Clemons references specifically identified Clemons as Kunco's murderer, even though Clemons had not yet been tried or convicted. These materials and events are "sensational, inflammatory, and slanted toward conviction." *Tharp*, 830 A.2d at 529.

However, the existence of inflammatory pretrial publicity, by itself, does not entitle a defendant to relief. Unfavorable attention always will be drawn to a defendant in a sensational murder case, particularly in today's digital age. Such coverage or online activity will necessitate a change of venue only when the "publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated." *Karenbauer*, 715 A.2d at 1092. We agree with the trial court that the publicity did not rise to that level in this case.

First, although the publicity at times touched upon those factors that we have delineated as potentially giving rise to a presumption of prejudice, our review of the record demonstrates that much of the news coverage of this case consisted of objective, fact-based articles and reports that dispassionately relayed information to the public. Many of the articles simply reported that Kunco was killed, that Clemons was suspected in the murder, and that he was arrested. Although some of the articles reference Clemons' prior

criminal activities, as the trial court noted, those articles were "scattered" among the news coverage and were not the norm. Trial Ct. Op., 4/23/2014, at 4.

Second, although the trial court was "significantly concerned with the content of the events held by 'Karissa's Army,'" the court held that the group's "small web presence" and associated activities did not create the widespread publicity necessary to presume prejudice. *Id.* at 5-6. Clemons does not counter this conclusion in his brief to this Court, nor do we find any basis in the record to dispute the trial court's ruling. Clemons did not establish what portion of the people that viewed, or participated on, the Facebook page was resident in Washington County. Similarly, Clemons did not demonstrate that the rallies and events held by "Karissa's Army" occurred in Washington County. As such, there is no basis to conclude that Washington County was deeply or extensively saturated by the actions of "Karissa's Army." The same can be said of the petition seeking changes to the domestic violence laws in Pennsylvania. Even though the petition apparently referenced Clemons as Kunco's murderer, there is no basis ascertainable in the record to believe that the petition negatively or enduringly affected the pool of potential jurors in Washington County.

Third, Clemons' reliance upon the racially charged ramblings in the online forums maintained by the "National Blackfoot Soldier" organization similarly is unavailing. Clemons produced no evidence, before either the trial court or this Court, indicating that this group's activities affected Washington County in any way, let alone to the degree that a fair and impartial jury could not be selected there as a result of its online discussions, however inflammatory they may have been.

Last, and perhaps more importantly, all of the events upon which Clemons relied in seeking a change in venue occurred prior to November 12, 2012. Clemons' jury was selected in March 2015, and his trial occurred in May 2015. Approximately two and one-

half years had passed between the challenged pretrial publicity and Clemons' trial. This "cooling off" period sufficed to ameliorate any potential prejudicial impact of the publicity and to "ensure that the selected jurors would be able to fairly and impartially consider the case against" Clemons. *Commonwealth v. Drumheller*, 808 A.2d 893, 903 (Pa. 2002). Clemons makes no attempt in his brief to overcome the impact of this "cooling off" period.

For these reasons, we agree with the trial court that, although some of the pretrial activity was troubling, there is no basis to conclude that the publicity had saturated Washington County in such a prejudicial manner that no fair and impartial jury could be empaneled there. Consequently, we find no abuse of discretion in the trial court's order denying Clemons' motion for a change of venue.


## VII. Motion to Suppress Statement

In his fifth issue, Clemons argues that the trial court erroneously denied his motion to suppress the statement that he provided to Trooper Schuster at the Pennsylvania State Police barracks. After Clemons had turned himself in, Trooper Schuster and Trooper Wilson placed Clemons inside an interview room. Once Clemons was settled there, Trooper Schuster informed him of all of his applicable constitutional rights via the familiar *Miranda* warnings. Clemons did not indicate that he understood his rights in any way, nor did he expressly agree to waive those rights. Instead, when asked if he understood his rights, Clemons spontaneously stated, "I just want to let you guys know you have it all wrong. I did not kidnap her. She picked me up at the top of Maytide. We stopped at the bank, began to argue. She hit me in the head. That's all I remember." N.T., Vol. III, 5/6/2015, at 123.

Clemons argues that this statement should have been suppressed. He maintains that, because he did "not make even one manifestation of understanding of his rights

before speaking to police," he did not waive those rights knowingly, intelligently, or voluntarily. Brief for Clemons at 28-30.

We review the denial of a motion to suppress by examining whether the trial court's factual findings are supported by the record. In doing so, we consider all of the evidence of the Commonwealth, as the prevailing party, as well as any defense evidence that was uncontradicted. *Commonwealth v. Martin*, 101 A.3d 706, 719 (Pa. 2014) (citation omitted). We are bound by any factual findings that are supported by the record. *Id.* However, we owe no deference to any legal conclusions drawn by a trial court. Thus, because the admissibility of a confession is a question of law, we review it *de novo*. *Briggs*, 12 A.3d at 320-21; *Commonwealth v. Nester*, 709 A.2d 879, 881 (Pa. 1998).

> As a general rule, because of the inherently coercive nature of police custodial interrogation, statements elicited from an accused in that environment are inadmissible unless the accused was informed of and, *inter alia*, voluntarily waived his privilege against self-incrimination and the right to counsel. Waiver is made voluntarily if the decision to make it is the product of a free and unconstrained choice. In determining whether a waiver is valid, a suppression court looks to the totality of the circumstances surrounding the waiver, including but not limited to the declarant's physical and psychological state, the attitude exhibited by the police during the interrogation, and any other factors which may serve to drain one's powers of resistance to suggestion and coercion.

*Commonwealth v. Lyons*, 79 A.3d 1053, 1066 (Pa. 2013) (internal citations omitted).

Clemons asserts, in part, that his statement was involuntary because he did not explicitly waive his constitutional rights. However, a verbal expression of waiver is not necessarily a prerequisite to a valid waiver. *Commonwealth v. Bomar*, 826 A.2d 831, 843 (Pa. 2003). The operative inquiry is "whether the defendant in fact knowingly and voluntarily waived the rights delineated in [*Miranda*]." *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369 (1979)). "Waiver can be clearly inferred from the actions and words of the

person interrogated." *Id.*[8] We must ascertain whether Clemons manifested an intent to waive, and an understanding of, his rights at the time that he uttered his statement to Trooper Schuster. *See Commonwealth v. Hughes*, 639 A.2d 763, 770 (Pa. 1994).

Clemons' argument that he did not knowingly and voluntarily waive his rights is two-pronged. First, Clemons maintains that he was too intoxicated to understand and waive his rights. *See* Brief for Clemons at 28 ("Trooper Schuster observed that Mr. Clemons had a heavy smell of alcohol about him at the time of questioning. . . ."). Second, Clemons asserts that he made no indication, verbal or otherwise, that he comprehended the rights read to him and that he expressed no conscious desire to abandon those rights. *Id.* at 28-29. We take each point in turn.

Clemons correctly asserts that, beginning with the point in time at which he turned himself in to the police, everyone who came into contact with him later testified that he smelled strongly of alcohol. However, as the trial court determined, Clemons was not so intoxicated that he no longer "had sufficient mental capacity at the time he gave the statement to know what he was saying and to have voluntarily intended to say it." Trial. Ct. Op. 7/15/2014, at 5 (citing *Commonwealth v. Ventura*, 975 A.2d 1128 (Pa. Super. 2009)). The trial court explained that Clemons "was able to walk while handcuffed through

---

[8]     In *Commonwealth v. Bussey*, 404 A.2d 1309 (Pa. 1979), a plurality of this Court would have rejected the "implicit waiver" principle articulated by the Supreme Court of the United States in *Butler*, and would have held that, as a matter of Pennsylvania constitutional law, an explicit waiver was in fact required before a confession could be deemed voluntary. However, as a plurality opinion, *Bussey* is not a binding precedent. *See Bomar*, 826 A.2d at 844 n.13. A majority of this Court never has adopted the *Bussey* plurality's rule. Presently, Clemons cites *Bussey*, and acknowledges that it is not binding precedent. *See* Brief for Clemons at 28-29. He does not, however, ask this Court to adopt the *Bussey* plurality's explicit waiver rule. In fact, Clemons does not even articulate whether his claim is predicated upon the United States Constitution, the Pennsylvania Constitution, or both. He merely advocates that we reach the same ultimate conclusion as we did in *Bussey*, to wit, that the waiver of constitutional rights was involuntary.

the barracks at the direction of the troopers. He was responsive to the questions asked him, and he asserted his right to counsel." *Id.*

These factual determinations are supported by the suppression record. Trooper Wilson testified that Clemons smelled like alcohol and had bloodshot eyes. However, the trooper detected no inability to think and act coherently. Clemons did not stumble or require assistance exiting the vehicle or walking to, and inside, the barracks. Trooper Wilson noted that Clemons did not experience any difficulties complying with directives while being searched. Trooper Wilson observed that Clemons spoke softly, but did not slur or mumble.

Similarly, Trooper Schuster detected a strong smell of alcohol emanating from Clemons. After Trooper Schuster advised Clemons of his *Miranda* warnings, Clemons made the statement at issue. The trooper testified that, despite the alcoholic odor, Clemons did not slur or mispronounce any words when delivering the statement.

Aside from the "heavy smell of alcohol about him," Brief for Clemons at 28, Clemons provides no other argument relevant to his purported level of intoxication. Thus, because the facts relied upon by the trial court are supported by the record, and because Clemons advances no convincing substantive argument, we discern no basis to disturb the trial court's conclusion that Clemons was not too intoxicated to knowingly waive his constitutional rights.

Next, Clemons argues that any purported waiver of his rights was unknowing or involuntary, because he did not indicate, verbally or otherwise, that he understood those rights, or that he intended to waive them, before he provided Trooper Schuster with an incriminating statement. As noted above, there is no formal protocol that must precede a waiver of rights. *See Bomar*, *supra*. All that is necessary to evince a waiver of rights is a manifestation of understanding and intent, a conclusion that can rest upon the actions

and words of the person being questioned. Here, there is ample evidence that Clemons understood, and that he desired to waive his rights.

As explained above, Clemons was not too inebriated to comprehend what Trooper Schuster explained to him. Clemons did not ask for clarification of any of his rights, nor did he appear to the troopers to be confused by anything that he was told. Second, and perhaps most telling, after making his statement, Clemons stopped the interrogation and requested the presence of an attorney. By doing so, Clemons manifested a clear understanding that discussing matters with the police could be used against him, that doing so might not be in his best interest, that he could halt the interrogation, and that he had the right to counsel, all of which directly contradicts the crux of his argument. In other words, Clemons manifested his understanding of his rights by actually asserting those rights. For these reasons, we agree with the trial court that Clemons' statement was the product of a knowing and intelligent waiver of his constitutional rights.

## VIII. Admissibility of Evidence

In his final argument, Clemons argues that the trial court erroneously allowed two pieces of prejudicial evidence into the record. We address each in turn.

First, Clemons takes issue with Officer Biagini's statement at trial that he (Biagini) contacted Washington County Adult Probation in an attempt to find an address for Clemons at a time when Kunco was believed to be a missing person. Officer Biagini explained that he contacted Washington probation authorities because he "had heard that it was possible that there was a warrant for [Clemons] for failing to report or whatever the situation was with regard to his probation to see what address they might have had for him." N.T., Vol. I, 5/4/2015, at 89. Clemons argues that the reference to probation had no probative value, particularly because Officer Biagini did not speak with anyone there.

Instead, the statement only "served to create a reasonable inference that there was an association between Mr. Clemons and adult probation." Brief for Clemons at 35. The trial court provided a curative instruction to the jury to ensure that the jurors did not misuse the evidence. However, Clemons argues that the instruction "did not effectively dissolve the prejudice created by the association between Mr. Clemons and the Adult Probation Office." *Id.* Clemons maintains that the trial court should have stricken the statement instead of providing an ineffectual curative instruction. Finally, Clemons argues that the reference to probation amounted to inadmissible character evidence by creating the impression that Clemons had a propensity to commit crimes.

"The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion." *Commonwealth v. Weber*, 701 A.2d 531, 534 (Pa. 1997). At trial, Clemons objected to Officer Biagini's reference to probation upon the basis of relevance. N.T., Vol. I, 5/4/2015, at 90-91. "Evidence is admissible if it is relevant—that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact—and its probative value outweighs the likelihood of unfair prejudice." *Commonwealth v. Boczkowski*, 846 A.2d 75, 88 (Pa. 2004) (citations omitted); *see also* Pa.R.E. 401; 403.

On January 11, 2012, Kunco's mother and stepfather reported to Officer Biagini that they believed Kunco was missing and that Clemons had something to do with her disappearance. As part of his efforts to locate either Kunco or Clemons, Officer Biagini contacted various law enforcement agencies in an attempt to locate addresses that may have been associated with Clemons, all of which could in turn have been possible locations where Kunco might have been found. Officer Biagini testified that he contacted Washington County Adult Probation for this purpose. The statement was relevant to the

investigation of the murder and to establish the actions taken by the police to find Kunco after the missing persons report. *See Drumheller*, 808 A.2d at 905 (holding that evidence may be relevant to prove "the chain or sequence of events that formed the history of the case" or to demonsrate the "natural development of the case").

Nonetheless, there is some merit to Clemons' assertion that the statement was unduly prejudicial. By referring to the possibility that Clemons was on probation and that there may have been a warrant for his arrest in connection with that probation, Officer Biagini gave the clear impression to the jury that Clemons had been in trouble with the law in the past, and that Clemons was unable to comply with the probationary consequences of a previous criminal offense. Nonetheless, any prejudice that may have resulted from the officer's utterances, as well as any potential misuse of the statement as character evidence, was ameliorated by the curative instruction, which the trial court gave at Clemons' request. *See Commonwealth v. Stokes*, 839 A.2d 226, 230 (Pa. 2003) ("A jury is presumed to follow the court's instructions."). Clemons offers only broad assertions that the instruction was insufficient to cure any potential defect, and provides no compelling reason as to why the jury could not follow the court's instructions. Under these circumstances, we discern no abuse of discretion in the trial court's decision to permit the relevant evidence, subject to a limiting instruction.

Next, Clemons maintains that the trial court should have excluded photographs of Kunco's injuries that resulted from the domestic abuse incident that led to the PFA against Clemons. The photographs depicted scratches, redness, and bruising on Kunco's face. The Commonwealth filed a pretrial motion *in limine* seeking permission from the trial court to admit the photographs. The Commonwealth maintained that the photographs were relevant to establish the history of the case, to explain the escalation of violence in the case, and to demonstrate Clemons' motive, malice, intent, and ill-will toward the victim.

*See* Brief for the Commonwealth at 50. Prior to trial, Clemons argued that the prejudicial effect of the photographs outweighed their purported probative value, thus warranting exclusion from evidence under Pa.R.E. 403.

In support of its asserted bases for admissibility, the Commonwealth relied upon our decision in *Drumheller*, as it does presently. *See* Brief for the Commonwealth at 49-50. In *Drumheller*, the trial court permitted the Commonwealth to introduce evidence of three prior PFA petitions and orders that the victim had obtained against Drumheller before he murdered her. *Drumheller*, 808 A.2d at 903-04. This Court agreed with the trial court's ruling, noting that these prior bad acts were "relevant to demonstrate . . . the continual and escalating nature of Drumheller's abuse," explained the "chain or sequence of events that formed the history of the case," established the "natural development" of the case, and demonstrated Drumheller's "motive, malice, intent, and ill-will" toward the victim. *Id.* at 905 (internal citation and quotation marks omitted).

In *Drumheller*, we addressed only the admissibility of PFA petitions and orders for these evidentiary purposes, not the admissibility of photographs depicting the injuries sustained by the victims of the abuse that led to the issuance of those orders. Nonetheless, we see no reason in this case to differentiate between the content of the PFA petition and the photographs associated with injuries resulting from the abuse. Like a PFA petition, photographic evidence can demonstrate "the continual and escalating nature of [the] abuse . . . [and it] shows the chain or sequence of events that formed the history of the case, is part of the natural development of the case, and demonstrates [] motive, malice, intent, and ill-will . . . ." *Id.* at 905. That such photographic evidence may be admissible under certain circumstances does not mean that it is always so. Like all other evidentiary proffers, photographic evidence associated with a PFA petition is subject to the applicable rules of evidence, including the necessary assessment of

whether the probative value of the evidence outweighs the "danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

We agree with the trial court and the Commonwealth that the photographs were admissible in this case. The photographs were relevant here for the same reasons that the PFA petition was relevant. The only question is whether the photographs were unduly prejudicial. Clemons contends that the prejudicial impact of the photographs outweighed their probative value because the content of the PFA petition established all that the Commonwealth sought to prove, reducing or eliminating the photographs' probative value. Their admission, Clemons contends, served no purpose beyond inflaming the passions of the jury. *See* Brief for Clemons at 36-37.

The fact that the photographs and the PFA petition were relevant for the same purpose does not, *ipso facto*, render the photographs inadmissible pursuant to Rule 403. On appeal, Clemons must establish that the photographs were "needlessly" cumulative. Under the specific circumstances of this case, he has not done so. Nothing about the nature of the photographs here supports Clemons' argument that this evidence was unduly prejudicial in the trial of this case. The photographs depict redness, swelling, and minor abrasions on Kunco's face. The injuries appear neither gruesome nor inflammatory. For all of these reasons, the probative value of the photographs outweighed their prejudicial effect. The trial court's evidentiary ruling, therefore, was not an abuse of discretion.

## IX. Statutory Review of the Death Penalty

By statute, we are required to affirm Clemons' death sentence unless we find that its imposition was the product of passion, prejudice, or any other arbitrary factor, or that

the Commonwealth's evidence did not support at least one aggravating factor. See 42 Pa.C.S. § 9711(h)(3). Following our comprehensive review of the record, we are convinced that the sentence imposed upon Clemons was not the product of passion, prejudice, or any other arbitrary factor. Rather, that sentence resulted from the substantial evidence proving that Clemons deliberately and maliciously killed Kunco. We also conclude that the aggravating circumstances found by the jury were supported by ample evidence. Finally, the jury having performed its duties under the relevant death penalty statute, *see* 42 Pa.C.S. § 9711, we discern no basis to reject its decision to impose the death penalty in this case.

## X. Conclusion and Mandate

Based upon the foregoing, Clemons is not entitled to relief. We affirm the judgment of sentence. We direct the Prothonotary to transmit a copy of the record and this opinion to the Governor pursuant to 42 Pa.C.S. § 9711(i).

We relinquish jurisdiction.

Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.

Chief Justice Saylor joins Section I-IV and VI-X, concurs in the result as to Section V, and authors a concurring opinion.