J-A30031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| N.K.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| R.J.L. | : | |
| | : | |
| Appellant | : | No. 1193 MDA 2019 |

Appeal from the Order Entered June 19, 2019
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2015-CV-1450-CU

BEFORE:   DUBOW, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                **FILED: DECEMBER 31, 2019**

Appellant, R.J.L. ("Father"), appeals from the order dated June 19, 2019, granting him primary physical custody of two of his biological children, P.L. (born 2001)[1] and J.L. (born 2009), granting Appellee, N.K.L. ("Mother"), primary physical custody of four of their biological children, M.L. (born 2005), B.L. (born 2011), H.L. (born 2012), and C.L. (born 2013) (collectively, "Children"[2]), and granting Father and Mother ("Parents") shared legal custody of all six children.  After careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Between the entry of the custody order at issue and the filing of this decision, P.L. has reached the age of majority.

[2] As discussed in more detail below, Father only contests the custody of the four children who are in Mother's physical custody, M.L., B.L., H.L., and C.L.

In 2015, Parents separated, and a custody order was entered giving Father primary physical custody of all six children. N.T. at 47, 77. Parents later reconciled.

In July 2018, with Father's knowledge and consent, Mother and Children moved from Harrisburg, Pennsylvania, to Davenport, Florida. *Id.* at 36, 38, 67. P.L. was about to begin his senior year in high school, and he and Father, along with J.L.,[3] decided to remain in Pennsylvania until P.L.'s graduation. *Id.* at 38, 116. At the time of Mother and Children's move, the entire family expected that Father, J.L., and P.L. would eventually be joining Mother and Children in Florida. *Id.* However, by October 2018, Parents' relationship began to deteriorate.

> The instant matter was initiated by [Father] by the filing of a Petition for Modification of Custody Order and an Emergency Petition For Special Relief in Custody on or about January 18, 2019, asking th[e trial c]ourt to grant him sole legal and primary physical custody of [Parents'] six (6) children . . . A hearing was held on the Emergency Petition on February 11, 2019. An Interim Order was entered on February 11, 2019 which provided for primary [p]hysical [c]ustody of [P.L.] and [J.L.] with Father and

---

Accordingly, for expediency, when "Children" is used hereinafter, it shall only refer to these four minors.

[3] The record is unclear as to why J.L. remained in Pennsylvania. The only explanation was given by Mother, who testified:

> I wanted [J.L.] to go but he had, I want to assume that he talked to [J.L.] while I was away for that month because [J.L.] kept saying he wanted to move and then when I would come back he would say I can't leave dad. He needs a buddy.

N.T. at 116.

- 2 -

primary physical custody of [Children] to [Mother], without prejudice to Father's custody modification request.

Trial Court Opinion ("TCO"), filed June 19, 2019, at 1.

"During the custody modification hearing on March 28, 2019, four witnesses were presented: Father, Mother, and their children P.L., age 17 at the time who resides with Father in Pennsylvania, and M.L., age 13 who resides with Mother in Florida." TCO, filed August 12, 2019, at 3.

Father testified that he has a flexible work schedule selling "utility trailers" and is able to be home with Children as needed. N.T. at 36. Father continued that, in addition to the six children he has with Mother, he has six other children from two previous relationships, all of whom are now adults, the eldest being 51 years old;[4] all but one are now living in Pennsylvania. *Id.* at 36-37.[5] He also testified that he has grandchildren. *Id.* at 37. His only testimony about the living arrangements in his Pennsylvania home was that J.L. has his own bedroom. *Id.* at 89.

Father testified "that there was one incident where a neighbor reported that [C.L.] was wearing only a diaper and was running around outside [Mother's] residence [in Florida] without the supervision of an adult." TCO, 6/19/2019, at 3. When asked about his "concerns with the area [Mother] lives

---

[4] Father's date of birth does not appear in the certified record.

[5] Father did not testify as to whether any of his adult children living in Pennsylvania would be able to provide childcare for their half-siblings.

in," Father complained about alligators, snakes, and "Hispanics" trying "to get under [Mother's] dress." N.T. at 57-59.

Father continued that, despite sharing legal custody, he never called Children's schools or doctors to inquiring about what services they were receiving, because he "was afraid that they wouldn't talk to [him] . . . because of [Mother] blocking them." *Id.* at 96. Father knew, however, that all six children had health insurance through Pennsylvania's Children's Health Insurance Program ("CHIP"). *Id.* at 62.

Father additionally testified that an incident "was reported to child services in Florida" but provided no specifics. *Id.* at 57; *see also id.* at 72 ("I g[o]t a call from Children Services in Florida"). He asserted that "Dauphin County Children and Youth have been involved in this family for 35 years"[6] and that, in 2015, "Children and Youth came to the house on a complaint and field tested [Mother, who] tested positive for cocaine[.]" *Id.* at 47, 63.

"Father testified that Mother has a lot of physical health issues." TCO, 6/19/2019, at 10.

> Q. Does [Mother] have current mental health diagnoses?
>
> A. She has mental and physical.
>
> [MOTHER'S COUNSEL]: Objection. Competence of the witness.
>
> THE COURT: That objection will be sustained. Let's move on.

---

[6] We note that Parents' eldest child was 17 years old at the time of the hearing, so it is unclear to whom "this family" was referring.

Q. Did you ever attend any appointments with her?

A. Any what?

Q. Any doctor appointments with her?

A. Yes.

THE COURT:   Could we have a timeframe on this?

Q. When was the last doctor appointment you attended?

A. The last doctor appointment I think was in 2013 or '14.

[MOTHER'S COUNSEL]: Objection.

THE COURT:   It will be sustained.

N.T. [at] 49.  The trial court then heard that Father picked up Mother's anti-depressant and a medication for her thyroid condition and that Father believed Mother had been hospitalized three times since December 17th[, 2018].  N.T. [at] 50.  Father's counsel asked

Q. What was the diagnosis?

[MOTHER'S COUNSEL]:   Objection.       Competence, relevance.

THE COURT:   Yes, that is sustained.  He wasn't the doctor. He wasn't there to diagnose her.

[FATHER'S COUNSEL]:   Right, but he was told by [M]other.

[MOTHER'S COUNSEL]:   Objection. Hearsay.

THE WITNESS:       I have it here in text.

THE COURT:   All right.  If you have a document to establish that she communicated what happened to her to him, we will allow it.

[FATHER'S COUNSEL]:     Your Honor, I can't ask anything about the first hospital visit then.  Was that the ruling?

THE COURT:   No, that is not the ruling.  The ruling is, you know, he can't give a diagnosis.  Now if there is a document that was from her to him that will establish there was some

sort of statement about why she was at the hospital at that time, I may allow that but we are not there yet.

BY [FATHER'S COUNSEL]:

Q: How long was she in the hospital?

A: In the emergency, just one day. The next day, the next day she went in with severe stomach pain, they admitted her. The next evening she checked herself out.

Q: And do you know the second time when approximately she was in the hospital?

A: That was the second, that was one and two.

Q: Okay.

A: The third time it had to be in January. It's in the documents there.

Q: And do you know how long she was there?

A: She said that, I think she was just in and checked into the emergency ward again. She was not admitted as far as I know on that time.

N.T. [at] 51-52.

The trial court sustained the objection of Mother's counsel and did not allow Father to provide a medical diagnosis for Mother.

TCO, 8/12/2019, at 5-7 (some formatting).

Mother was 39 years old at the time of the hearing. N.T. at 124. "[M]other testified that Father did not call [C]hildren for six (6) months and Mother contends that his only desire to see [C]hildren is an attempt to resume his relationship with her." TCO, 6/19/2019, at 2. Mother asserted "that Father abused her during the marriage," although "she never obtained a final Protection From Abuse [("PFA")] Order against Father." *Id.* at 3. Mother

knew that J.L. and P.L. have their own bedrooms in Father's house. N.T. at 132, 158.

> Mother testified that the children ride their bikes on the cul-de-sac at the front of the home, as she sits on a bench on that front porch, where she watches and supervises them. Additionally, Mother testified that she has a window blind open so she can watch the kids when they are outside and see out into the cul-de-sac.

TCO, 6/19/2019, at 4.

Mother explained that the cul-de-sac "has four houses on [her] side but you have to understand that these houses aren't lived in. People buy them for vacation homes. So technically we have two neighbors and that is it." N.T. at 108. She clarified that the rest of the neighbors "are only there like a couple of months out of the year." *Id.* at 155. She stated that her rent is $2,300.00 per month. *Id.* at 145. Mother also testified that the house was "partially furnished" when she bought it. *Id.* at 162.

As for the incident described by Father where C.L. was outside the residence, unsupervised, in only a diaper, Mother explained that C.L. was under the supervision of Mother's "24-year-old stepdaughter," A.L., at the time and was just wearing a diaper since she had been swimming. TCO, 6/19/2019, at 4.[7] Additionally, Mother testified "that she has friends in

---

[7] A.L. is Father's daughter from a previous relationship, who was living in Florida at the time of the incident, but who has since moved to Chicago. *Id.* at 37, 52, 66.

Florida" who have "offered to watch" Children "when she is not home." *Id.* at 5.

> Mother's testimony indicated that [A.[8]], an instructor [at a] dance studio in Florida, has offered to help her and watch [C]hildren when Mother is unavailable. [M]other testified that [A.] lives next door and she is well aware of [Mother's] personal medical issues. Additionally, Mother testified that she has another friend who has offered to help her at any time.

*Id.* at 9. Mother continued that "maternal grandmother is available to travel to Florida to support Mother as needed" and "will relocate to Florida in the future to aid her with" Children. *Id.* at 6. Mother added that she had gone on a date with a local doctor in Florida, who was part Israeli, and, when Father visited, he screamed in front of H.L. that Mother was "f---ing a sand n-----." N.T. at 134.

"Mother testified that she takes [Children] with her to [M.L.]'s dance competitions" and that Children "are doing well in school in Florida." TCO, 6/19/2019, at 8-9.

Mother gave "extensive testimony" about her "medical conditions, prescription medication, hospitalization, mental health, and screens for controlled substances." TCO, 8/12/2019, at 8 (citing N.T. at 105, 111-14, 123-24). Mother testified that she "had anxiety when [she] lived in Pennsylvania at [Father's] home." N.T. at 141. She added that she had been taking Lexapro to treat her anxiety, but her doctor had recently stopped her

---

[8] Mother did not provide A.'s family name.

prescription. *Id.* "Mother testified that she was diagnosed with thyroid cancer" and "takes Levothyroxine every morning and completes a blood screening." TCO, 6/19/2019, at 10. Mother stated that "the cancer did not affect her ability to take care of her children." *Id.* Finally,

> Mother's testimony indicated that she has a history of drug use and as a result had supervised visit[ation] with all children in 2015. However, Mother stated that the drug test in 2015 was invalid and indicated that her thyroid medication was what caused the drug test to be positive. Also, Mother had a negative drug test following a recent allegation of drug use this year. . . . Mother testified that she is willing to take a drug test at any time.

*Id.* "At that time, Father's counsel had the opportunity to cross examine Mother on these issues." *Id.* (citing N.T. at 141-45, 149-53). During this cross-examination, Mother denied a diagnosis of depression, answered questions about Children's health insurance, and admitted that her 2015 drug test was positive for cocaine but denied using marijuana. N.T. at 141-45.

P.L. "did not express a desire to live in Florida" but "stated that his siblings should live with Mother because she can care for them better than Father." TCO, 6/19/2019, at 4 (citing N.T. at 9). When asked if he would like to have all his siblings live with him in Pennsylvania, he answered, "I just don't like having a lot of siblings" but would like to see them for "a holiday[.]" N.T. at 6. P.L. was worried that J.L. -- the brother who was living with him and was nine-years-old at the time of the hearing -- "was watching inappropriate videos on his phone" and playing video games rated "M for mature game[,]" like *Friday the 13th* and "first person shooters" with "blood and gore[,]" and

that Father does not properly supervise J.L.'s use of technology, even after P.L. discussed his concerns with Father. *Id.* at 7, 10-11; *see also* TCO, 6/19/2019, at 3.

P.L. also testified that Father "does get mad sometimes" and "overreacts sometimes" and that they "don't really do much together." N.T. at 4. He felt that "the only time [he and Father] communicate" is "when we are eating" and that he could "talk more" with Mother than Father. *Id.* P.L. confessed to doing "[n]ot so well" in school while living with Father and that Father had told him that his schooling was "a waste of time[.]" *Id.* at 5, 11. When asked if he had any plans for what he wanted to do after high school, he answered, "Not really." *Id.* at 5. He stated that he has his own bedroom at Father's residence. *Id.* at 18-19.

According to M.L., in the house in Florida, she has her own bedroom upstairs, B.L. has his own bedroom upstairs, H.L. and C.L. share a bedroom upstairs, Mother has a bedroom downstairs, and there is an extra guest bedroom, a yard, and a pool. N.T. at 32-33. M.L. testified that, "after Mother's move to Florida in July of 2018, [M]other would take her to all of her classes, provide breakfast for her and her other siblings, and take all of the [C]hildren to school." TCO, 6/19/2019, at 4. She also testified "that she wants to remain in Mother's care and did not express a strong affinity to her brothers in Pennsylvania or a desire to reside with Father." TCO, 8/12/2019,

at 4 (citing N.T. at 25, 27). She added that Mother's "cancer did not affect [Mother's] ability to take care of her children." TCO, 6/19/2019, at 10.

When M.L. was told that she could step down from the stand, she asked if she could "say something" else. N.T. at 35. After the trial court gave her permission, without further prompting, she testified as follows:

> [Father] would teach the kids like some bad words and like if he, so if he saw a different colored person, he would just call them the N word and I was like why would you do that because I have a friend that is a different color and he would probably just look at her and say that and I would be like why would you say that because it's not nice.

*Id.*

Father's counsel stated that she had "Children and Youth on standby" but decided that she was not "going to use them[.]" N.T. at 35.

On June 19, 2019, the trial court entered the aforementioned custody order and an accompanying opinion analyzing each of the "custody factors" articulated in 23 Pa.C.S. § 5328(a).[9] On July 18, 2019, Appellant filed this

---

[9] In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and

which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

timely appeal and a statement of errors complained of on appeal. On August 12, 2019, the trial court entered a second opinion, pursuant to Pa.R.A.P. 1925(a).

Father presents the following issues for our review:

1.     Whether the [t]rial [c]ourt erred as a matter of law and/or abused its discretion in granting [Mother] primary physical custody of [Children] when the evidence and custody factors did not support such a finding.

2.     Whether the [t]rial [c]ourt erred as a matter of law and/or abused its discretion in failing to allow testimony regarding [Mother]'s mental and physical condition.

Father's Brief at 13 (suggested answers omitted).

We begin by acknowledging our scope and standard of review in custody cases:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are

---

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

- 13 -

> unreasonable in light of the sustainable findings of the trial court.

**D.K. v. S.P.K.**, 102 A.3d 467, 478 (Pa. Super. 2014) (quoting **J.R.M. v. J.E.A.**, 33 A.3d 647, 650 (Pa. Super. 2011)).

In the current action, Father first contends that "the trial court erred as a matter of law and/or abused its discretion in granting Mother primary physical custody of" Children. Father's Brief at 18. He argues that "the evidence and custody factors did not support such a finding." **Id.** Father urges this Court to reject the conclusions of the trial court about the first, second, third, fourth, fifth, eighth, twelfth, fourteenth, and fifteenth custody factors and, instead, to find that these nine factors are strongly in his favor. **Id.** at 18-25, 27-30 (citing 23 Pa.C.S. § 5328(a)(1)-(5), (8), (12), (14)-(15)).

For the first custody factor, "[w]hich party is more likely to encourage and permit frequent and continuing contact between the child and another party[,]" 23 Pa.C.S. § 5328(a)(1), Father maintains that "Mother is clearly not the party who will encourage and permit contact between [C]hildren and Father[,]" whereas he "is more likely to encourage and permit contact between Mother and the minor children." Father's Brief at 18-19. However, while the trial court acknowledged that Mother "has limited Father's contact with [C]hildren[,]" the trial court also noted that "[M]other testified that Father did not call his children for six (6) months" and "that his only desire to see the children is an attempt to resume his relationship with her." TCO, 6/19/2019, at 2. Accordingly, contrary to Father's insistence that this factor

is strongly in his favor, it is, at best, neutral to both Parents, and we must accept findings of the trial court that are supported by competent evidence of record. *See D.K.*, 102 A.3d at 478.

For the second custody factor, "[t]he present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child[,]" 23 Pa.C.S. § 5328(a)(2), Father stresses the fact that Mother never obtained a final PFA order against him. Father's Brief at 19. However, the trial court did not find the fact that Mother chose not to pursue a final PFA order against Father as evidence that Father did not abuse her, and "our role does not include making independent factual determinations." *D.K.*, 102 A.3d at 478. Additionally, the trial court noted that Father's supervision of J.L. has been questionable, finding "his supervision of [J.L.]'s cell phone and electronics usage" to be "lax[.]" TCO, 6/19/2019, at 3; *see also* N.T. at 7, 10-11. The trial also expressed concern about Father allowing J.L. "to view inappropriate images." TCO, 6/19/2019, at 3; *see also* N.T. at 7, 10-11. The trial court did not express similar concerns about Mother and concluded that she was "able to provide adequate safeguards and supervision over the children[,]" TCO, 6/19/2019, at 4, and we "must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." *D.K.*, 102 A.3d at 478.

Father places his greatest emphasis on the third custody factor, "[t]he parental duties performed by each party on behalf of the child[,]" 23 Pa.C.S. § 5328(a)(3), expressing "serious concerns with Mother's judgment as a parent and her ability to appropriately provide for the minor children[,]" including allegations that Mother allows the children to "play[] in the street unsupervised." Father's Brief at 20-21. Contrary to Father's assertions, M.L. testified that "Mother now provides all care for [Children] including their nutritional, educational, and medical needs." TCO, 8/12/2019, at 4; *see also* TCO, 6/19/2019, at 4.

As for Father's contention that Mother fails to supervise the children, this argument is more pertinent to the second custody factor concerning "adequate physical safeguards and supervision[.]" 23 Pa.C.S. § 5328(a)(2). To the extent that supervision were to be considered pursuant to the third factor, we would note that Mother testified that she watches Children from a bench on the front porch or through an open window blind when they are outside, including when they ride their bicycles in the cul-de-sac in front of her home. TCO, 6/19/2019, at 4. As for the incident where C.L. was outside the residence wearing only a diaper, Mother clarified that C.L. was dressed for swimming and was supposedly being watched by another adult, A.L., at the

time. *Id.* at 3. Father identified no other specific occurrences of Children being inadequately supervised.[10] *See* Father's Brief at 21.

Thus, based upon Mother's and M.L.'s testimony, the trial court appropriately found that Mother "is performing the parental duties for" Children. TCO, 6/19/2019, at 5.

For the fourth custody factor, "[t]he need for stability and continuity in the child's education, family life and community life[,]" 23 Pa.C.S. § 5328(a)(4), Father argues that he "is better able to provide stability for" Children. Father's Brief at 22. For this factor, the trial court found the testimony of Parents' two teenaged children who testified to be critical. TCO, 8/12/2019, at 4 ("Critically, the testimony of P.L. and M.L. indicated that the children are building stability in their present homes and prefer to remain where they are."). P.L. – who was almost an adult and who continues to live with Father – "stated that his siblings should live with Mother **because she can care for them better than Father**." *Id.* (emphasis added) (citing N.T. at 9). P.L. also told the trial court that he was doing "not so well" in school

_____

[10] Although Father testified that an incident "was reported to child services in Florida" and that he "g[o]t a call from Children Services in Florida[,]" these assertions were so vague that no conclusions can be drawn from them. N.T. at 57, 72.

Similarly, although Father stated that "Dauphin County Children and Youth have been involved in this family for 35 years[,]" he elected not to call a case worker from Children and Youth to testify, even though one was "on standby"; accordingly, the record lacks specifics about that agency's involvement with Children. *Id.* at 35, 63.

while living with Father, that Father had discouraged his education, and that he had no plans after high school. N.T. at 5, 11. "M.L. likewise testified that she wants to remain in Mother's care and did not express a strong affinity to her brothers in Pennsylvania or a desire to reside with Father." TCO, 8/12/2019, at 4 (citing N.T. at 25, 27). Mother also testified that she has friends in Florida who help supervise Children and are part of their lives. TCO, 6/19/2019, at 5. Based upon this evidence, the trial court concluded: "Given the ability of each parent to care for the children presently in their care, the stability that the children are building in their current homes, and the lack of reasons to change that arrangement, the trial court concluded that the children should remain where they are currently residing." TCO, 8/12/2019, at 4. The trial court's conclusion is not "unreasonable as shown by the evidence of record." **D.K.**, 102 A.3d at 478.

For the fifth custody factor, "[t]he availability of extended family[,]" 23 Pa.C.S. § 5328(a)(5), Father notes that "all of the maternal and paternal family live in Pennsylvania." Father's Brief at 23. While Father's statement may be currently accurate,[11] Mother testified that "maternal grandmother is available to travel to Florida to support Mother as needed" and "will relocate to Florida in the future to aid her with" Children, thereby ameliorating Father's

---

[11] With the exception of Children's half-sibling, A.L., who now lives in Illinois.

concern about the lack of any extended family in Florida. TCO, 6/19/2019, at 6.

Father concedes the sixth and seventh custody factors, 23 Pa.C.S. § 5328(a)(6)-(7), recognizing that "[t]estimony established that the minor children all appear to get along fairly well"[12] -- although he "would prefer all minor children living together at least within the same state" -- and that the seventh factor "is neutral as P.L. would like to remain with Father and M.L. would like to remain with Mother." Father's Brief at 23-24.

For the eighth custody factor, "[t]he attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm[,]" 23 Pa.C.S. § 5328(a)(8), Father insists that he "offered unrefuted testimony that Mother has made active attempts to turn [C]hildren against him." Father's Brief at 24. Nevertheless, Father's testimony was not "unrefuted" as he claims, *id.*, because "Mother contended that Father is not interested in contact with [C]hildren and only uses them to have contact with her." TCO, 6/19/2019, at 7; *see also id.* at 2.

---

[12] Despite Father's concession, we note that P.L. actually testified that he did not like having a lot of siblings and had no desire to have them live with him in Pennsylvania, N.T. at 6, and that M.L. "did not express a strong affinity to her brothers in Pennsylvania[.]" TCO, 8/12/2019, at 4 (citing N.T. at 25, 27).

For the ninth and tenth custody factors, Father admits that both Parents "clearly love their children[,]" "are able to provide emotional support and nurturing for the minor children[,]" and "are equally available during the day to care for [C]hildren's needs." Father's Brief at 25.[13] For the tenth factor, 23 Pa.C.S. § 5328(a)(10), Father takes issue with Mother's ability to attend to Children's "educational . . . needs" but acknowledges that Children "are doing well in school in Florida." Father's Brief at 26; **see also** TCO, 6/19/2019, at 8 (M.L. testified that Mother takes Children to school and M.L. to dance classes; Mother testified that Children are doing well in school in Florida).[14] For the eleventh custody factor, the fact that Parents "reside

_____

[13] Although we do not need to address the ninth custody factor, as Father does not contest the trial court's conclusion that Mother "can maintain a loving relationship with their children[,]" TCO, 6/19/2019, at 8, we observe that P.L. -- the only child who was living with Father who testified -- gave some evidence that calls into question Father's ability to fulfill his children's "emotional needs." 23 Pa.C.S. § 5328(a)(9). P.L. testified about Father's anger issues, his tendency to overreact, their lack of activity together, and their minimal communication, even though Father only had P.L. and one other child living with him at the time. N.T. at 4. P.L. also thought that he had better communication with Mother than Father. **Id.**

[14] Similarly, although we do not need to address the tenth custody factor, as Father does not address any other part of this factor besides Children's educational needs, Father's Brief at 26, we note that this factor includes consideration of Children's "physical . . . needs[.]" 23 Pa.C.S. § 5328(a)(10). Mother and Children's living arrangement in Florida allows each of the Children to have his or her own bedroom and has a pool and a yard for Children's exercise and play. N.T. at 32-33. Although there was testimony that P.L. and J.L. have their own bedrooms in Father's residence, **id.** at 18-19, 89, 132, 158, no evidence was presented as to whether Father had enough bedrooms at his home for each of the six children or whether there was a yard or other

- 20 -

approximately one thousand (1,000) miles apart" does not favor either party, although it is, as Father observes, "not conducive to a shared custody arrangement or frequent custody exchanges." Father's Brief at 26.

For the twelfth custody factor, "[e]ach party's availability to care for the child or ability to make appropriate child-care arrangements[,]" 23 Pa.C.S. § 5328(a)(12), Father states that he "is better able to care for the minor children" due to "flexible work schedule" and ability "to be home with the children as needed." Father's Brief at 27. Preliminarily, we note that this assertion by Father appears to contradict his concession pursuant to the tenth custody factor that both he and Mother "are equally available during the day to care for [C]hildren's needs." *Id.* at 25. Furthermore, Father ignores that Mother has a circle of friends who aid in childcare, including her next-door neighbor, A., "an instructor [at a] dance studio in Florida, [who] has offered to help her and watch [C]hildren when Mother is unavailable" and who "is well aware of [Mother's] personal medical issues." TCO, 6/19/2019, at 9. We find the trial court's conclusion that Mother is able to provide care for Children to be reasonable. *See D.K.*, 102 A.3d at 478.

For the thirteenth custody factor, Father appreciates that he and Mother "struggle to communicate regarding the minor children without argument."

---

space for Children to exercise and to play. *See generally id.* Accordingly, the record is insufficient to find that Father's house in Pennsylvania would be better than or even comparable to Children's living arrangements in Florida.

Father's Brief at 28. As both Parents are equally at fault, this factor does not favor either Mother or Father.

For the fourteenth custody factor, "[t]he history of drug or alcohol abuse of a party or member of a party's household[,]" 23 Pa.C.S. § 5328(a)(14), Father avers that "Mother has a history of drug use and, as a result, had supervised visits with all children in 2015." Father's Brief at 28. Father alleges that this factor should weigh in his favor. *Id.* Nevertheless, the trial court considered that "Mother has a history of drug use" but recognized "that no longer seems to be an issue[.]" TCO, 8/12/2019, at 4; *see also* TCO, 6/19/2019, at 10.

For the fifteenth custody factor, "[t]he mental and physical condition of a party or member of a party's household[,]" 23 Pa.C.S. § 5328(a)(15), Father highlights Mother's "serious health concerns[,]" including her diagnoses of anxiety and thyroid cancer and her prior need for psychiatric medication. Father's Brief at 29-30. Nonetheless, the trial court considered Mother's thyroid cancer, daily medication, and blood screenings, TCO, 6/19/2019, at 10, but found the most important evidence to be Mother's and M.L.'s testimony that Mother's "ongoing health issues . . . do not prevent her from parenting." TCO, 8/12/2019, at 4; *see also* TCO, 6/19/2019, at 10.[15]

---

[15] For the sixteenth, "catch-all" custody factor, the trial court concluded that "[t]here was no testimony that would indicate that any additional factors . . . were applicable." TCO, 6/19/2019, at 11. Father does not propose that there

For the reasons set forth above, we conclude that, based upon the evidence of record, the trial court did not abuse its discretion in entering the custody order of June 19, 2019, giving primary physical custody of Children to Mother. *See D.K.*, 102 A.3d at 478.

Next, Father suggests that "the trial court erred as a matter of law and/or abused its discretion in failing to allow testimony regarding Mother's mental and physical condition." Father's Brief at 31. The trial court sustained Mother's objections to Father's counsel asking him "Does [Mother] have current mental health diagnoses?" and "What was the diagnosis?" TCO, 8/12/2019, at 5-6 (quoting N.T. at 49-50).

According to Father, his "counsel attempted to examine [him] regarding Mother's physical and mental condition; however, on objection by opposing counsel, the evidence was precluded as irrelevant." Father's Brief at 31 (citing N.T. at 49). Father submits that he "had direct knowledge of Mother's mental health conditions" and "was not testifying as an expert witness or making a

_____

are "[a]ny other relevant factor[s]." 23 Pa.C.S. § 5328(a)(16). However, pursuant to our review of the record, we are disconcerted by the casual racism exhibited by Father. During his own testimony, Father mentioned "Hispanics" as one of his concerns about Mother living in Florida, suggesting they have criminal and sexual intent, and listed them along with dangerous animals like alligators and snakes. N.T. at 57-59. More importantly, Mother and M.L. both testified about Father using the "N word." *Id.* at 35, 134. Not only is Father's bigotry problematic in and of itself, Father has failed to appreciate the emotional impact that his use of slurs has on M.L., who was worried that he may use such language about a non-white friend of hers and who testified that "it's not nice." *Id.* at 35.

- 23 -

mental health diagnosis." ***Id.*** at 32. He attacks Mother's testimony about her mental health as "one-sided" and challenges the trial court's preclusion of his "testimony of first-hand experiences with Mother's medical care." ***Id.***

> The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. . . . Evidence is admissible if it is relevant—that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact—and its probative value outweighs the likelihood of unfair prejudice.

***Commonwealth v. Clemons***, 200 A.3d 441, 474 (Pa. 2019) (citations omitted).

According to the Pennsylvania Rules of Evidence, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"; an exception exists for "[a]n expert [who] may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Pa.R.E. 602, 703.

This Court further summarized the applicable law as follows:

> [A] lay witness may testify regarding matters of health, so long as **his testimony is confined to facts within his knowledge**, but the witness **may not testify to matters involving the existence or nonexistence of a disease**, which is discoverable only through the training and expertise of a medical expert.

***In re Mampe***, 932 A.2d 954, 960 (Pa. Super. 2007) (emphasis added). This restriction on lay witness testimony regarding medical diagnoses includes mental health diagnoses. ***See In re Involuntary Commitment of Barbour***, 733 A.2d 1286, 1288 (Pa. Super. 1999) (a lay witness may testify about the

- 24 -

apparent physical condition of a person, but may not testify regarding a medical diagnosis, such as the existence of bipolar disorder).

As the trial court discussed, "[m]ost of Father's complaints against Mother dated prior to the custody order that was entered in 2015. While the trial court allowed leeway for Father to establish some background, much of the information was not relevant to the current proceeding that sought to modify the 2015 custody order." TCO, 8/12/2019, at 5. Despite his claims of "direct knowledge of Mother's mental health conditions" and "first-hand experiences with Mother's medical care[,]" Father's Brief at 32, by his own admission, Father had not attended a doctor's appointment with Mother since 2014 at the latest. TCO, 8/12/2019, at 6 (citing N.T. at 49). Accordingly, he did not have "personal knowledge of the matter." Pa.R.E. 602; **see also Mampe**, 932 A.2d at 960 (lay witness's "testimony is confined to facts within his knowledge"). Additionally, he was not an expert witness and consequently was not permitted to testify about facts that he had "been made aware of[,]" Pa.R.E. 703, or "matters involving the existence or nonexistence of a disease," including a mental health disorder. **Mampe**, 932 A.2d at 960; **see also Barbour**, 733 A.2d at 1288. Ergo, the trial court's decisions to sustain Mother's objections to Father's attempts to testify regarding medical diagnoses for Mother were proper. **See** TCO, 8/12/2019, at 6-7 (citing N.T. at 50-52).

Assuming *arguendo* that the trial court's rulings were incorrect, the error was harmless, because, even without Father's testimony, there was

"extensive testimony" about Mother's "medical conditions, prescription medication, hospitalization, mental health, and screens for controlled substances." *Id.* at 8 (citing N.T. at 105, 111-14, 123-24). Mother testified candidly about her anxiety and thyroid cancer and about the medications that she had been taking for both. N.T. at 141; TCO, 6/19/2019, at 10. Furthermore, "Father's counsel had the opportunity to cross examine Mother on these issues[,]" TCO, 8/12/2019, at 8 (citing N.T. at 141-45, 149-53), including her mental health diagnosis and drug use, as well as Children's health insurance coverage. N.T. at 141-45. The trial court stated that it "found this testimony more than adequate in providing information that allowed the trial court to assess the impact that Mother's mental and physical conditions would have on the children." TCO, 8/12/2019, at 8. We observe that Father has failed to explain what additional information he would have provided had he been allowed to testify about Mother's mental and physical health. *See* Father's Brief at 31-32. Moreover, the trial court asserted that it "fully considered Mother's mental and physical condition along with Mother's credibility in making its determination on the custody modification." TCO, 8/12/2019, at 8. Most significantly, both Mother and M.L. testified that Mother's health "did not affect her ability to take care of her children." TCO, 6/19/2019, at 10. In conclusion, the trial court "both allowed testimony regarding Mother's physical and mental condition and fully considered these factors as part of its decision." TCO, 8/12/2019, at 8 (citing TCO, 6/19/2019, at 10).

For these reasons, we find that the trial court's decision to preclude Father's testimony about Mother's physical and mental health was not a clear abuse of discretion and hence cannot be reversed. **See Clemons**, 200 A.3d at 474.

We therefore affirm the trial court's custody order of June 19, 2019. **See D.K.**, 102 A.3d at 478.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/31/2019