J-S17006-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | :      PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| | : |
| TYRONE JOHNSON, JR. | : |
| | : |
| Appellant | :  No. 1893 EDA 2025 |

Appeal from the Judgment of Sentence Entered April 1, 2024
In the Court of Common Pleas of Monroe County
Criminal Division at No(s):  CP-45-CR-0000083-2021

BEFORE:   PANELLA, P.J.E., STABILE, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.:                    **FILED JUNE 18, 2026**

Tyrone Johnson, Jr. appeals *nunc pro tunc* from the judgment of sentence imposed for his convictions of two counts of first-degree murder and three counts of recklessly endangering another person ("REAP").[1] Johnson argues the trial court erred in failing to suppress his statement given to police because, he asserts, his ***Miranda***[2] waiver was not voluntary. After careful review, we affirm.

We obtained the following procedural and factual history from the certified record and evidence presented at the suppression hearing.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 2705, respectively.

[2] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

By criminal complaint filed on October 9, 2020, the Commonwealth charged Johnson with two counts of criminal homicide, one count of persons not to possess firearms, two counts of endangering welfare of children, and three counts of REAP, for shooting and killing Amir and Shadea Moore. Prior to trial, Johnson filed a motion seeking to suppress, in pertinent part, the statements he gave to police while he was in the hospital during the early morning hours after the shooting. A hearing on the motion was held on June 17, 2022. The following evidence was presented at the hearing.

On October 9, 2020, police were called to 151 Snowshoe Court in Mount Pocono Borough. Upon arrival, police did not immediately enter the apartment. They sought to secure the safety of the scene by having any occupants come outside to them. The officers yelled into the apartment for anybody in the house. A male, later identified as Johnson, responded to the officers' yells by stating he could not get up. Officers entered the apartment, saw one unresponsive male, and entered the bedroom where they heard Johnson. One officer assisted Johnson in walking outside. The police handcuffed Johnson at this time. Initially, Johnson was seated on the hood of a car outside the apartment. After Johnson told the officers he was shot in the head, the officers had EMS check on him.

Inside the apartment, police discovered the one unresponsive male was deceased. They then located an unresponsive female, also deceased. Police later identified the victims as brother and sister, Amir and Shadea Moore.

Johnson later told police he and Shadea were in a relationship and living together.

EMS transported Johnson to a helicopter, and he was flown to the hospital for treatment. Detective Donald Scarfo was assigned to report to the hospital to obtain Johnson's statement. Detective Scarfo arrived as the doctors were finishing treatment of Johnson's injury: a bullet wound to the back of his head. Doctors informed Detective Scarfo that Johnson was stable, alert, and conscious, and that Detective Scarfo could speak with him. Johnson was transferred to a private room, and Detective Scarfo sought to determine whether Johnson had the capacity to answer his questions.

First, Detective Scarfo explained to Johnson why he was there and asked Johnson to submit to a gunshot residue ("GRS") test. Johnson agreed. Next, Detective Scarfo asked Johnson the standard "head bump" questions: what the date was, who the president was, did he know where he was, etc. Johnson answered all questions appropriately. Detective Scarfo then obtained some biographical information before providing Johnson with his ***Miranda*** warnings.

Detective Scarfo recorded the interview, beginning with the biographical information obtained from Johnson. The recording was admitted as an exhibit at the suppression hearing held on June 17, 2022, and provided to this Court. As the trial court detailed the conversation contained on this recording, quoted below, we do not describe it here. We note that Johnson was able to answer

Detective Scarfo's questions appropriately and confessed to shooting both victims about 6 ½ minutes into the 40-minute interview.

Johnson did not testify on his own behalf at the suppression hearing. At the conclusion of the hearing, the trial court took the matter under advisement. On September 7, 2022, the trial court entered its order and opinion denying suppression.

After a trial held January 4, 2024, through January 11, 2024, the jury convicted Johnson of two counts of first-degree murder and three counts of recklessly endangering another person. The trial court sentenced Johnson to a total aggregate sentence of life imprisonment plus 3 to 6 years' incarceration on April 1, 2024.

Johnson did not file a post-sentence motion or appeal to this Court. Johnson, through new counsel, filed a Post-Conviction Relief Act ("PCRA")[3] petition on February 15, 2025, seeking, *inter alia*, reinstatement of Johnson's appellate rights *nunc pro tunc*. The court held a hearing on the petition on April 10, 2025. After allowing the parties time to brief the issue, the court granted Johnson's PCRA petition in part and reinstated his appellate rights *nunc pro tunc* on June 27, 2025.

_____

[3] 42 Pa.C.S.A. §§ 9541-9546.

Johnson filed a timely notice of appeal to this Court and complied with the court's order to file a Rule 1925(b) statement. The court authored its Rule 1925(a) opinion on September 10, 2025. *See* Pa.R.A.P. 1925(a), (b).

Johnson raises one question for our review:

Whether the trial court erred in denying the motion to suppress [Johnson's] statement given that [Johnson] could not voluntarily waive his *Miranda* rights or make a statement given that he was highly intoxicated and had been shot in the head[?]

Appellant's Brief, at 4.

We begin with our well-established standard and scope of review:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where … the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

In addition, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing.

*Commonwealth v. Andrews*, 213 A.3d 1004, 1014 (Pa. Super. 2019) (citations and quotation marks omitted).

Johnson argues he could not voluntarily waive his **Miranda** rights and therefore his confession to shooting Amir and Shadea should have been suppressed. **See** Appellant's Brief, at 20-21. The court determines whether a confession is voluntarily given by reviewing the totality of the circumstances surrounding the confession. **See id.** at 1015.

> Numerous factors should be considered under a totality of the circumstances test to determine whether a statement was freely and voluntarily made: the means and duration of the interrogation, including whether questioning was repeated, prolonged, or accompanied by physical abuse or threats thereof; the length of the accused's detention prior to the confession; whether the accused was advised of his or her constitutional rights; the attitude exhibited by the police during the interrogation; the accused's physical and psychological state, including whether he or she was injured, ill, drugged, or intoxicated; the conditions attendant to the detention, including whether the accused was deprived of food, drink, sleep, or medical attention; the age, education, and intelligence of the accused; the experience of the accused with law enforcement and the criminal justice system; and any other factors which might serve to drain one's power of resistance to suggestion and coercion.

**Id.** (citation omitted).

When an accused is advised of their constitutional rights pursuant to **Miranda**, "[t]he operative inquiry is whether the defendant in fact knowingly and voluntarily waived the rights delineated in **Miranda**. Waiver can be clearly inferred from the actions and words of the person interrogated." **Commonwealth v. Clemons**, 200 A.3d 441, 472 (Pa. 2019) (brackets, citation, and internal quotation marks omitted).

Our Courts continue to hold that:

> intoxication is a factor to be considered, but it is not sufficient, in and of itself, to render the confession involuntary. The test is whether there was sufficient mental capacity for the defendant to know what he was saying and to have voluntarily intended to say it. … [T]his standard is equally applicable to those instances where an accused was allegedly under the influence of drugs or narcotics at the time of his interrogation by police officials.

***Commonwealth v. Culberson***, 358 A.2d 416, 417 (Pa. 1976) (citations and quotation marks omitted); ***Commonwealth v. Palson***, 293 A.3d 634, *6 (Pa. Super. filed Feb. 22, 2023) (quoting and applying the standard from ***Culberson***).[4]

Johnson asserts he could not voluntarily, knowingly, and intelligently waive his ***Miranda*** rights due to his intoxication on LSD and marijuana and recent head injury. ***See*** Appellant's Brief, at 20, 24-25, 27-28. Johnson claims the answers he provided during the interrogation further support his argument that he could not intelligently waive ***Miranda*** because he was confused at times and struggled to answer some questions. ***See id.***

The Commonwealth notes that Johnson said he wanted to talk about what happened and that his confession to shooting the two victims came only 6 ½ minutes into the interrogation. ***See*** Appellee's Brief, at 8. Johnson was not subject to any coercive tactics by police. ***See id.*** Further, the Commonwealth points out that Detective Scarfo waited until after Johnson's head wound was treated and the doctor stated he could speak with Johnson,

_____

[4] Unpublished, non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value. ***See*** Pa.R.A.P. 126(b).

- 7 -

who was alert and conscious. *See id.* at 9. Finally, the Commonwealth focuses on Johnson's answers to Detective's Scarfo's questions and submits that he could not have been too intoxicated because he is able to provide accurate answers and even correct the detective when the detective stated something incorrect. *See id.* at 11-12.

The trial court aptly detailed its decision as follows:

[Johnson] points to his head wound, his voluntary consumption of LSD, and the fact that he had been up most of the night as reasons that his statements were involuntary. [Johnson] was admitted to the hospital with a gunshot wound to the back of the head. [Johnson's] toxicology report shows that LSD and THC were present in his system. Police received the initial call to respond to the apartment around 2:36 a.m. The interrogation at the hospital began at 4:50 a.m.

[The trial court] will address the interrogation in more detail below, … but as an initial matter, [the court] observe[d] that the entire interrogation lasted 40 minutes, including a seven-minute break (during which [Johnson] reinitiated conversation with the officer who remained in the room). At the beginning of the interrogation, after being *Mirandized*, [Johnson] said he wanted to talk about what happened that night. [Johnson's] confession came a mere six-and-a-half minutes into the interrogation. After establishing that there was a gun in the apartment, Detective Scarfo asked [Johnson], "Do you recall firing that gun?" [Johnson] said he did. Detective Scarfo then asked, "What did you fire at?" [Johnson] responded, "I fired at—I know that I shot both of them. Like I know that's what happened." He was not subject to a lengthy interrogation or overly-suggestive or repetitive questions prior to making these statements.

Moreover, the record indicates that his head wound was not prohibitively debilitating. Detective Scarfo credibly testified that [Johnson] was lucid and alert:

When I asked the doctor if he was okay to speak with, he said yes. He's alert and conscious. You can speak with him. Then I assessed that, based on my initial

questioning by answering the ***Miranda*** warnings. I asked him what the date was, who was the president of the United States, did he know where he was, so on and so forth. I don't know if the recording caught that or played that. I asked preliminary questions that EMT commonly ask people after a head bump. We ask children in sports events that suffer some type of head trauma—we'll ask them basic questions. And he answered them all correctly.

[The trial court] accept[ed] this testimony and believe[d] it show[ed] that [Johnson's] head wound did not prevent him from giving a valid waiver of his right to remain silent.

The closest question here is whether [Johnson's] use of LSD rendered him incapable of voluntarily, knowingly, and intelligently waiving his right to remain silent. …

[The trial court found] that the preponderance of the evidence supports the conclusion that [Johnson] had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it. The recording of the interrogation is particularly illuminating.

The recording begins with [Johnson] correctly giving his name, date of birth, age and address. He even corrects Detective Scarfo when Detective Scarfo misstates the year of [Johnson's] birth. [Johnson] was ***Mirandized*** by Detective Scarfo and stated that he understood his rights. When asked, "With your rights in mind, are you willing to speak with me in regards to what happened tonight?", [Johnson] responded, "I cannot make sense of what happened last night." Detective Scarfo then clarified, "But you want to talk about it?" [Johnson] answered, "Yes, I could talk, yes."

[Johnson] proceeded to demonstrate that he had an accurate, if not entirely complete, memory of what happened. He knew that an ambulance took him from his apartment. He explained, "I took 3 acid tablets. I was looking for a spiritual journey[,"] and described his experience on LSD. He knew he had been shot in the back of the head, but did not know if he had shot himself or if someone else had done it. He knew he had access to his girlfriend's gun and he knew it was a Springfield 9mm. Detective

Miller confirmed that the gun found on the bed in the apartment was a Springfield XD 9mm.

After confessing, [Johnson] correctly confirmed that one of the individuals shot was Shadea. When Detective Scarfo gave the wrong name for the second person who was shot, [Johnson] corrected Detective Scarfo and gave the right name: Amir, Shadea's brother. [Johnson] said he did not know why he shot them. He described feeling "mad nervous" and "mad paranoid." It seemed like he saw people outside. When Detective Scarfo asked if [Johnson] thought that the people outside were trying to harm him, [Johnson] did not blindly agree, and instead said, "Honestly I didn't know what to think. But I, like, I wanted to understand that it wasn't—I don't know—like I wanted to understand that it wasn't real." [Johnson] further explained, "I felt like I was about to die. … It felt like I had to kill them before they tried to kill me" and said that it played out "like a movie." [Johnson] later said, "I was just trying to get them to convince me that it wasn't real. What I was thinking wasn't real. I just wanted that comf—like the, seeking comfort. But it just felt like, that's like, it just felt like it was real." [The court] note[d] that by the time of his interrogation, [Johnson] realized that what he had perceived earlier while under the influence of LSD did not comport with reality.

Although [Johnson] said he did not remember who he shot first, he again said, "I know I shot both of them." He remembered that they were trying to calm him down. When asked about the bullets, "Do you know if it was like a full metal jacket or was it a hollow point?", [Johnson] responded, "Oh no, I don't know that. I know it wasn't no hollow tip." At the suppression hearing, Detective Miller identified the type of bullets found in the apartment, testifying, "We would call those a full metal jacket. These are not hollow points."

In trying to make sense of what happened, [Johnson] said:

> It's a part of me that's like not even trying to acknowledge what just happened last night. Like I know that [inaudible] that I call my baby, like the one that close to me. I killed her and I don't even know why. Or like, I can't even wrap my mind around that. But it just like, felt like my life was just being played out like a movie … and if I didn't make a decision, I was going to get killed.

When Detective Scarfo asked if he could photograph the wound on [Johnson's] head, [Johnson] replied, "Go ahead … I've got nothing to hide. You do whatever you have to do." Finally, when Detective Scarfo asked [Johnson] if there was anything else he wanted to say, [Johnson] answered, "When I'm able to make sense out of it then I'll definitely tell you." [Johnson] concluded, "I think tomorrow I should be able to give you better detailed information."

While attempting to explain his experience, [Johnson] said, "This is a perfect way to explain it." After pausing for about 15 seconds, he continued, "I just need to get my brain to come back … I just need some water, like something to make me come all the way to." Detective Scarfo then took a break from questioning and went to his car to get a camera. Following a period of silence, [Johnson] asked Officer Bohrman (who remained in the room with [Johnson]), "You're the [inaudible] I was speaking to right?" Officer Bohrman explained, "I was in here. You were speaking to the detective." [Johnson] then asked if Officer Bohrman had seen a particular movie that [Johnson] used to explain his experience. When Detective Scarfo returned, [Johnson] said, "I just need some [inaudible] get this pain out of my head. I'll be able to put some regular thoughts together." These interactions suggest that the bullet wound and perhaps the after-effects of the LSD may have had some impact on [Johnson's] state of mind, but not to the point where it caused him to be unaware of his circumstances or [unable] to render a valid waiver.

[The trial court was] convinced by a preponderance of the evidence that [Johnson] had the mental[] capacity to know what he was saying and intended to say it. He gave correct biographical information. The details about the night which he remembered were consistent with the physical evidence and the testimony of the police officers. He remembered that the gun was a Springfield 9mm and knew the bullets were not hollow points. He also knew who had been shot. He responded to Detective Scarfo's questions appropriately, at times agreeing with, at times disagreeing with, and at times nuancing what Detective Scarfo had said.

***

In light of the totality of the circumstances, [the trial court found] that neither [Johnson's] head wound, consumption of LSD, or the

early-morning hour prevented [Johnson] from voluntarily, knowingly, and intelligently making his statements. The statements are therefore admissible.

Trial Court Opinion, 9/7/22, at 7-13 (record citations and footnotes omitted).

After our thorough review of the suppression hearing transcript and recording of Johnson's interview, we agree with the trial court and commend the trial court for its comprehensive review of this issue. Johnson was not subject to a lengthy interrogation. ***See*** N.T. Suppression Hearing, 6/17/22, Exhibit 17. The entire interview lasted 40 minutes. ***See id.*** Less than seven minutes into the questioning, Johnson admitted to shooting both Shadea and Amir. ***See id.*** at 06:44-06:56. The questions up to this point were not repetitive, prolonged, or accompanied by abuse or threats. ***See Andrews***, 213 A.3d at 1015. Furthermore, Johnson emphatically agreed to speak with Detective Scarfo when asked. ***See*** N.T. Suppression Hearing, 6/17/22, Exhibit 17, at 01:35-01:50. While Johnson admitted that he was unable to make sense of some of what he saw and experienced while under the effects of LSD, it was clear that, at the time he was interviewed, he was no longer hallucinating or experiencing these effects. ***See id.*** at 01:35-01:50; 03:17-04:35; 07:43-10:45; 20:30-23:00. Finally, it is noteworthy that Johnson did not blindly agree with anything Detective Scarfo said, and corrected Detective Scarfo's misunderstandings or inaccurate statements on more than one occasion. Johnson clearly stated when he did not know the answer to a question, such as who he shot first. ***See id.*** at 24:58-25:25. Therefore, we

agree with the trial court that Johnson knew what he was saying and voluntarily intended to say it. **See Culberson**, 358 A.2d at 417.

We therefore affirm Johnson's judgment of sentence and find the trial court did not err in denying suppression of his confession.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>6/18/2026</u>